# In re A-M-E & J-G-U-, Respondents

*Decided as amended January 31, 2007[1]*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Factors to be considered in determining whether a particular social group exists include whether the group's shared characteristic gives the members the requisite social visibility to make them readily identifiable in society and whether the group can be defined with sufficient particularity to delimit its membership.

(2) The respondents failed to establish that their status as affluent Guatemalans gave them sufficient social visibility to be perceived as a group by society or that the group was defined with adequate particularity to constitute a particular social group.

FOR RESPONDENT: Roberto Tschudin Lucheme, Esquire, Glastonbury, Connecticut

BEFORE: Board Panel: HURWITZ, Acting Vice Chairman; HOLMES and MILLER, Board Members.

HOLMES, Board Member:

The United States Court of Appeals for the Second Circuit has remanded this case for consideration of the question whether "affluent Guatemalans" are members of a particular social group within the definition of a "refugee" in section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (2000). *Ucelo-Gomez v. Gonzales*, 448 F.3d 180 (2d Cir. 2006).[2] As discussed below, we conclude that the Immigration Judge did not err in ruling that the respondents failed to establish that "affluent Guatemalans" are a particular social group within the meaning of the Act. We further find no error in his ruling that the respondents did not otherwise demonstrate that they were persecuted or face a well-founded fear of persecution on account of a protected ground in the refugee definition. We

---

[1] On our own motion, we amend the June 19, 2006, order in this case. The amended order makes editorial changes consistent with our designation of the case as a precedent.

[2] We note that subsequent to our June 19, 2006, decision, the Second Circuit issued an order amending its opinion in this case. *Ucelo-Gomez v. Gonzales*, 464 F.3d 163 (2d Cir. 2006). Because our decision was issued prior to that amendment, it refers to the court's initial order.

will therefore dismiss the respondents' appeal from the Immigration Judge's decision denying their applications for asylum and withholding of removal.[3]

## I. FACTUAL AND PROCEDURAL HISTORY

The respondents are a married couple from Guatemala. They entered the United States in August 2001 using forged travel visas and false names. In sworn statements completed upon arrival at the San Ysidro Port of Entry, the male respondent indicated that he left his home country to come to the United States to "look for work" and the female respondent indicated that she came to visit her uncle in Los Angeles. In response to the question whether they had "any fear or concern about being returned to [Guatemala] or being removed from the United States," both respondents answered, "No."

In proceedings before the Immigration Judge, the respondents conceded removability but requested relief based on their claim of persecution.[4] In her asylum application filed on January 2, 2003, the female respondent provided the following account of events in Guatemala:

> My sister was kidnapped in December of 1996, and held until January, 1997. She was shot in the leg during the kidnapping. I started receiving extortionious [sic] threats, and threats against my life and that of my husband. We were forced to continually change our location, and such threats against ourselves continued until we sought refuge in the United States.
> We feel that at the very least, we will be harassed and threatened by the same group or groups that persecuted us in the past, and at worse, we could be found, kidnapped, physically harmed, even killed. The motivation for these threats are the same as those that caused harm to my sister: class hatred by organized political gangs.

At the hearing before the Immigration Judge, the respondents claimed to have been persecuted on account of membership in a particular social group composed of "higher socio-economic" Guatemalans. The Second Circuit summarized the female respondent's testimony before the Immigration Judge as follows:

> She came from a well-off family; she and her husband had a good life in Guatemala; they own a house that is presently rented out; the couple employed a housekeeper; and she attended college and obtained a teacher's degree.
> In December 1996, the couple received anonymous phone calls demanding ransom for the release of [her] sister, and threatening that, unless the ransom was paid, they would face the same fate.
> By reason of telephonic and written threats, [the respondents] moved (in October 1998) to another town in Guatemala but the threats resumed several months later, forcing them to move once more.

---

[3] The respondents did not appeal the Immigration Judge's denial of other relief for which they had applied.

[4] The female respondent filed the asylum application, with her husband named as a derivative beneficiary.

> After their final relocation, [the respondents] were unemployed and subsisted off savings and investment income.
>
> [The female respondent] twice reported the threats to the police, to no apparent effect.
>
> The couple never paid her sister's ransom, but the sister was released by her captors after they "saw her wounded in her leg."

*Ucelo-Gomez v. Gonzales*, *supra*, at 182-83.

At the conclusion of the hearing, the Immigration Judge asked who was included within the proposed particular social group. Counsel for the respondents explained, "Basically, they are comprised on a relative scale at a higher socio-economic level, so they're being persecuted for that reason." The Immigration Judge then asked what information indicates "that people like this are being persecuted." Counsel for respondents replied:

> Well, it's rather ambiguous, Your Honor. For example, if you're looking through the *Country Report*, when people are being victimized in Guatemala, there's official reports . . . that it may be criminal activity, but NGOs report that it . . . seems like there's evidence that it may be related to other reasons . . . .

After further questioning, counsel for the respondents described the proposed social group as "the upper class."

The Immigration Judge denied asylum and withholding of removal, finding, in part, that the respondents failed to demonstrate that "affluent Guatemalans" were a particular social group. In so concluding, he applied *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), and *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991), a decision of the Second Circuit, the circuit in which this case arises. Under these cases, he found that the proposed group was not a particular social group because the group's shared characteristic was not "immutable," the group was not readily "identifiable," and it was "too broad[ly]" defined to be a social group for purposes of obtaining asylum. He also found that the respondents had not provided sufficient evidence to show that similarly-situated Guatemalans could be identified by would-be persecutors. In particular, he found that there was "nothing in the background materials to indicate that wealthy Guatemalans are specifically being targeted for persecution." Additionally, he found no evidence that the persons calling the respondents were motivated to persecute them on account of their social group membership or any other protected ground.[5]

In their appellate brief, the respondents, through counsel, conceded that persecution based on "wealth alone is insufficient" to meet the nexus

---

[5] The Immigration Judge also found that the threats to the respondents did not rise to the level of harm required to demonstrate past persecution. He also made an adverse credibility finding based primarily on the conflict between the respondents' statements upon arrival that they had no fear of returning to Guatemala and their subsequent asylum claim to the contrary. We assume, without deciding, that the respondents provided a truthful account in their asylum application and in their testimony before the Immigration Judge.

requirement and argued that the persecution "was motivated in part by [their] political opinion/membership etc." This concession was consistent with our holdings in several published decisions that "in the absence of evidence to suggest other motivations, evidence that the perpetrators were motivated by a victim's wealth will not support a finding of persecution." *Matter of S-V-*, 22 I&N Dec. 1306, 1310 (BIA 2000) (holding, in a case involving fear of kidnaping by Colombian guerrillas, that actions motivated by "perceived wealth" were insufficient, without more, to support a finding of persecution based on membership in a particular social group), *overruled on other grounds by Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003); *see also Matter of V-T-S-*, 21 I&N Dec. 792, 799 (BIA 1997) (finding that where the "common trait shared by the victims of kidnappings in the Philippines is wealth, i.e., their ability to pay large ransoms," the respondent did not demonstrate that persecution was on account of an enumerated ground); *Matter of T-M-B-*, 21 I&N Dec. 775, 779 (BIA 1997) (finding no persecution on account of a protected ground where "the NPA's practice of securing financial support by the threats of force and actual harm [was] motivated by the victim's wealth, not the victim's political opinion"), *rev'd, Borja v. INS*, 175 F.3d 732 (9th Cir. 1999) (en banc) (finding imputed political opinion on the facts); *cf. Bolshakov v. INS*, 133 F.3d 1279, 1281 (9th Cir. 1998) (holding that successful Russians targeted by criminals for extortion were not persecuted on account of a statutorily protected ground).

The respondents' arguments on appeal consisted of four paragraphs addressing the requisite nexus to a protected ground, the final one of which stated the substance of the argument as follows:

> The Respondents membership in the upper-class of Guatemala, and the history suffered by the family at the hands of terrorists, indicates they are targets of persecution. The IJ felt wealth alone is insufficient, and that is conceded. But, at trial, counsel for the Respondents indicated that in the U.S. State Department Country Report for Guatemala, p. 8, that there was a report that a nun was killed in Guatemala City, in what was reported as an attempted carjacking, but "various human rights groups did not rule out the possibility of political motive." The IJ noted that the nun dealt with war victims, and thus felt convinced that this could serve as some kind of imputed political ideology. This same issue was raised by counsel at trial, when he argued that the position of the Respondents was akin to a "mixed motives" case–as amply demonstrated by the case of the nun cited in the Country Report. *See also*, *Borja v. INS*, 175 F.3d 732 (9th Cir. 1999) (Persecution does not necessarily entail persecution for reasons exclusive to five classes. Thus if persecutor was motivated in part by victim's political opinion/membership etc., a successful claim to asylum can be made.)

Given the evidence of record, the nature of the Immigration Judge's decision, and the respondents' arguments on appeal, we affirmed the Immigration Judge's decision without opinion. *See* 8 C.F.R. § 1003.1(e)(4) (2006).

After the Second Circuit remand, we afforded the parties an opportunity to provide further briefing. The respondents have submitted a supplemental brief in which they argue that "although it is true that Respondents did not know the motivation of their persecutors, such knowledge is not fatal to their case. So long as the actions were, at least in part, by one of the enumerated grounds [sic]." They further assert that they were persecuted based on social group membership combined with imputed political opinion, stating that they "are arguing (in part) that their political beliefs are imputed to them by virtue of their wealth i.e. they must support the status quo as it protects the wealth they have accumulated."

## II. ANALYSIS

The Second Circuit has directed us on remand to "expand upon" *Matter of Acosta*, *supra*, as to the meaning of "particular social group" and to explain why "affluent Guatemalans" are not a "particular social group." *Ucelo-Gomez v. Gonzales*, *supra*, at 187-88. Initially, we note that the respondents have the burden of demonstrating both that they were members of a particular social group and that past or feared persecution satisfied the "on account of" requirement in the "refugee" definition. 8 C.F.R. § 1208.13(a) (2006). In meeting this burden, the respondents must initially identify the "group" on which the claim is based and demonstrate that such a group is a "particular social group" as that term is used in the "refugee" definition. The proposed group has been variously described during the course of these proceedings in terms of "wealth," "affluence," "upper income level," "socio-economic level," "the monied class," and "the upper class." Although we generally refer to wealth or affluence as the identifying characteristic in our discussion below, our analysis applies to each of these descriptions of the group characteristic.

### A. Particular Social Group

In *Matter of Acosta*, *supra*, at 233, we established that the members of a particular social group must "share a common, immutable characteristic." The characteristic may be innate, such as "sex, color, or kinship ties," or it may be a shared past experience such as "former military leadership or land ownership." *Id*. In either event, the group characteristic must be one "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id*.

We agree with the Immigration Judge that "wealth" is not an immutable characteristic. This determination alone, however, is not dispositive if, for example, the shared characteristic is so fundamental to identity or conscience that it should not be expected to be changed. In this regard, we would not

expect divestiture when considering wealth as a characteristic on which a social group might be based. Nonetheless, we find that the Immigration Judge correctly applied the *Matter of Acosta* framework in conjunction with the Second Circuit's decision in *Gomez v. INS*, *supra*, in determining that the proposed group of "wealthy" Guatemalans is not so readily "identifiable" or sufficiently defined as to meet the requirements of a *particular* social group within the meaning of the refugee definition.

We recently reaffirmed the importance of social visibility as a factor in the particular social group determination in *Matter of C-A-*, 23 I&N Dec. 951, 957 (BIA 2006) (holding that "noncriminal informants working against the Cali drug cartel" in Colombia were not a particular social group), *aff'd*, *Castillo-Arias v. U.S. Attorney General*, 446 F.3d 1190 (11th Cir. 2006), *cert. denied sub nom. Castillo-Arias v. Gonzales*, ___S. Ct. ___, 2007 WL 36174 (U.S. Jan. 18, 2007) (No. 06-642). In reaffirming the requirement that the shared characteristic of the group should generally be recognizable by others in the community, we relied, in part, on the Second Circuit's view that "'the attributes of a particular social group must be recognizable and discrete.'" *Id.* at 956 (quoting *Gomez v. INS*, *supra*, at 664); *see also Matter of H-*, 21 I&N Dec. 337 (BIA 1996). In addition, we referred to the 2002 guidelines of the United Nations High Commissioner for Refugees, which endorse an approach in which an important factor is whether the members of the group are "perceived as a group by society." *Id.* at 956. Although a social group cannot be defined exclusively by the fact that its members have been subjected to harm, we noted that this may be a relevant factor in considering the group's visibility in society. *Id.* at 960.

In *Matter of C-A-*, *supra*, we also considered whether the group was defined with the requisite particularity. *Id.* at 957. We found that the respondent's proposed group of "noncriminal informants" was "too loosely defined to meet the requirement of particularity." *Id.* In so holding, we noted that we do not generally require a "voluntary associational relationship," "cohesiveness," or strict "homogeneity among group members." *Id.* at 956-57.

### 1. Social Visibility

Whether a proposed group has a shared characteristic with the requisite "social visibility" must be considered in the context of the country of concern and the persecution feared. The respondents in this case are victims of threats of criminal extortion. As the Immigration Judge found, there is little in the background evidence of record to indicate that wealthy Guatemalans would be recognized as a group that is at a greater risk of crime in general or of extortion or robbery in particular. The June 1997 country profile for Guatemala states:

> With the signing of the [1996] peace accords, the guerrillas renounced the use of force to achieve political goals. Although the level of crime and violence now seems to be higher than in the recent past, the underlying motivation in most asylum cases now appears to stem from common crime and/or personal vengeance.
>
> The situation is further complicated by the fact that criminal elements, including some former combatants, are taking advantage of the instability of the transitional period. An August 1996 public opinion poll showed that 70 percent of those interviewed considered violence the major problem in Guatemala. In the past, most acts of violence in the country tended to be regarded as politically motivated, but the public perception seems to be changing now that the civil war has ended.

Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Guatemala-Profile of Asylum Claims & Country Conditions* 4 (June 1997) [hereinafter *Profile*]. Neither the 1997 *Profile* nor the Department of State's 2001 country report on Guatemala suggests that the affluent, however defined, are exposed to more violence or human rights violations than other segments of society. *See* Committees on International Relations and Foreign Relations, 107th Cong., 2nd Sess., *Country Reports on Human Rights Practices for 2001* (Joint Comm. Print 2002). Rather, violence and crime in Guatemala appear to be pervasive at all socio-economic levels. The respondents have provided no evidence, and we have no reason to believe, that the general societal perception would be otherwise.[6] Notably, the only specific reference to "extortion or robbery" in the *Profile* occurs in the context of attacks against Indians, a relatively impoverished group in Guatemala. *Profile*, *supra*, at 5. From the point of view of a criminal bent on extortion, persons with relatively modest resources or income may possess sufficient land, crops, or other forms of wealth to make them potential targets. The proposed group of "wealthy Guatemalans" therefore fails the "social visibility" test.[7]

---

[6] We do not rule out the possibility that, in appropriate circumstances, "wealth" may be a shared characteristic of a social group. For example, should a government institute a policy of imprisoning and mistreating persons with assets or income above a fixed level, there could be a basis for a societal perception that the class of wealthy persons, as defined by the government, would constitute a particular social group.

[7] In *Gao v. Gonzales*, 440 F.3d 62 (2d Cir. 2006), the court recognized that women sold into marriage in a part of China where forced marriages are valid and enforceable were a particular social group. In so holding, the court distanced itself from *Gomez v. INS*, *supra*, suggesting that "*Gomez* can reasonably be read as limited to situations in which an applicant fails to show a *risk* of future persecution on the basis of the 'particular social group' claimed, rather than as setting an *a priori* rule for which social groups are cognizable." *Gao v. Gonzales*, *supra*, at 69. At the time of the Immigration Judge's decision and our summary affirmance, however, the approach outlined in *Gomez v. INS*, *supra*, and the Board's decision in *Matter of H-*, *supra*, established that "social visibility" was an important factor in identifying a "particular social group."

## 2. Particularity

The respondents' proposed group also fails the particularity requirement of the refugee definition. The terms "wealthy" and "affluent" standing alone are too amorphous to provide an adequate benchmark for determining group membership. Depending upon one's perspective, the wealthy may be limited to the very top echelon; but a more expansive view might include small business owners and others living a relatively comfortable existence in a generally impoverished country. Because the concept of wealth is so indeterminate, the proposed group could vary from as little as 1 percent to as much as 20 percent of the population, or more.[8]

The respondents' proposed social group is indeterminate, and not just at the margins, as will often be the case in describing group membership. Rather, when "wealth" is the sole criterion, group membership is difficult to delimit for a large swath of potential members. The characteristic of wealth or affluence is simply too subjective, inchoate, and variable to provide the sole basis for membership in a particular social group. We therefore find that the respondents have not demonstrated that "wealthy Guatemalans" constitute a particular social group.

## B. Other Motives for Persecution

The respondents have not provided evidence to show that the person or persons making the threats against them were motivated by the respondents' political opinion or imputed political opinion.[9] Nor have they shown that the threats were motivated by "class envy." Indeed, the respondents are unaware of the identity of the person or persons who threatened them, or the group with which they are affiliated, if any. The respondents have produced no evidence to show that the anonymous caller or callers had any motive other than attempted criminal extortion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (finding that a claim that guerrilla recruitment attempts were based, in part, on imputed political opinion was unsupported by either direct or circumstantial evidence that the persecutor had a motive other than increasing the size of its forces). Here there is no indication that the person or persons who pursued the respondents had any motive other than increasing their own wealth at the expense of the respondents. We therefore find that the respondents failed to demonstrate that they were persecuted or have a well-founded fear of persecution based on a protected ground.

---

[8] The 1997 *Profile* notes that 80 percent of Guatemalans live in poverty, with 59 percent in extreme poverty. *Profile*, *supra*, at 10.

[9] As the Second Circuit noted, the female respondent "concede[d] that neither she nor her husband had any political involvement." *Ucelo-Gomez v. Gonzales*, *supra*, at 182 n.1.

## III.  CONCLUSION

We concur with the Immigration Judge's finding that the respondents failed to demonstrate that "affluent Guatemalans" are a particular social group or that they were persecuted or fear persecution on account of a protected ground in the refugee definition.   Accordingly, we agree that they failed to demonstrate eligibility for asylum or withholding of removal.   We will therefore dismiss the respondents' appeal.

**ORDER:**  The respondents' appeal is dismissed.