Mario **ROMERO**, Amanda Villegas de Romero, Waldo Romero Villegas, Claudia Marcela Romero Villegas, Victor Mario Romero Villegas, Lorena Romero Villegas, Petitioners,

v.

Michael B. **MUKASEY**, Attorney General of the United States,[1] Respondent.

No. 07–1401–ag.

United States Court of Appeals, Second Circuit.

Jan. 31, 2008.

---

1. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto Gonzales as a respondent in this case.

Matthew L. Guadagno, Kerry Bretz, Jules E. Coven, Bretz & Coven, LLP, New York, New York, for Petitioners.

Peter D. Keisler, Assistant Attorney General, Civil Division, Michelle Gordon Latour, Assistant Director, Jamie M. Dowd, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for Respondents.

PRESENT: Hon. WILFRED FEINBERG, Hon. CHESTER J. STRAUB, Hon. RICHARD C. WESLEY, Circuit Judges.

### SUMMARY ORDER

Mario Romero, Amanda Villegas De Romero, Waldo Romero Villegas, Claudia Marcela Romero Villegas, Victor Mario Romero Villegas, and Lorena Romero Villegas, natives and citizens of Colombia, seek review of a March 7, 2007, order of the BIA affirming the January 29, 2002, decision of Immigration Judge ("IJ") Annette Elstein denying their applications for asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). *In re Mario Romero, Amanda Villegas De Romero, Waldo Romero Villegas, Claudia Marcela Romero Villegas, Victor Mario Romero Villegas, Lorena Romero Villegas,* No. A76 949 922/923/924/925/76 946 807/808 (B.I.A. Mar. 07, 2007), *affg* No. A76 949 922/923/924/925/76 946 807/808 (Immig. Ct. N.Y. City Jan. 29, 2002). We assume the parties' familiarity with the underlying facts and procedural history of the case.

When the BIA adopts the decision of the IJ and supplements the IJ's decision, this Court reviews the decision of the IJ as supplemented by the BIA. *See Yan Chen v. Gonzales,* 417 F.3d 268, 271 (2d Cir. 2005). We review the agency's factual findings under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see, e.g., Zhou Yun Zhang v. I.N.S.,* 386 F.3d 66, 73 & n. 7 (2d Cir.2004), *overruled in part on other grounds by Shi Liang Lin v. U.S. Dep't of*

*Justice,* 494 F.3d 296, 305 (2d Cir.2007). However, we will vacate and remand for new findings if the agency's reasoning or its fact-finding process was sufficiently flawed. *See, e.g., Cao He Lin v. U.S. Dep't of Justice,* 428 F.3d 391, 406 (2d Cir.2005); *Tian–Yong Chen v. INS,* 359 F.3d 121, 129 (2d Cir.2004). Because the IJ found that Romero was credible and the BIA did not disturb that finding, we assume his credibility. *See Yan Chen,* 417 F.3d at 271–72.

## I. Asylum and Withholding of Removal

### A. Particular Social Group

■ To be eligible for asylum, an alien must show that he or she has suffered past persecution, or has a "well-founded fear" of future persecution, on account of his or her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Similarly, eligibility for the withholding of removal requires an alien to show that "it is more likely than not that his [or her] 'life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.' " *Ramsameachire v. Ashcroft,* 357 F.3d 169, 178 (2d Cir.2004) (quoting 8 U.S.C. § 1231(b)(3)(A)). In *Matter of Acosta,* the BIA explained that a "particular social group" may be defined by a "common, immutable characteristic," which includes "an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership." 19 I. & N. Dec. 211, 233 (B.I.A. 1985), *overruled in part on other grounds y Matter of Mogharrabi,* 19 I. & N. Dec. 439 (B.I.A.1987).

In his petition for review, Romero argues that the BIA did not properly apply its own standards for what constitutes a "particular social group" as articulated in *Acosta* and *Matter of A–M–E & J–G–U–,*

24 I. & N. Dec. 69 (B.I.A.2007), *aff'd by Ucelo–Gomez v. Mukasey,* 509 F.3d 70 (2d Cir.2007). Specifically, Romero asserts that the BIA erred in finding that the IJ correctly applied *Acosta* to find that landowners do not constitute a particular social group because *Acosta* explicitly provided landowners as an example of a group defined by an immutable trait, i.e., shared past experience. Indeed, the BIA's own interpretation of *Acosta* provides that "wealth" itself is not an immutable characteristic, but it also recognizes that such a conclusion does not necessarily dispose of *every* claim of membership in a "particular social group." *Matter of A–M–E & J–G–U–,* 24 I. & N. Dec. at 73. Where "wealth" is so fundamental to an individual's "identity or conscience" that it should not be expected to be changed, the BIA has recognized the possibility of such a membership claim for asylum and withholding or removal purposes. *Id.* The BIA further explained that in order to constitute a particular social group, a proposed group must (1) exhibit a shared characteristic that is socially visible to others in the community, and (2) be defined with sufficient particularity. *Id.* at 74–76.

Here, the BIA concluded that, like the asylum applicant's proposed social group of wealthy Guatemalans in *Matter of A–M–E & J–G–U–,* Romero's proposed group of "wealthy Colombians" fails to meet the statutory test of establishing a cognizable social group under the refugee definition. However, in *Matter of A–M–E & J–G–U–,* the BIA explained that the determination of "whether a proposed group has a shared characteristic with the requisite 'social visibility' must be considered in the context of the country" of persecution. *Id.* at 74. In that case, the BIA concluded that there was insufficient record evidence to indicate that wealthy Guatemalans were recognizably at greater risk of being targeted for extortion, rob-

bery, or other crimes, and that the State Department reports did not suggest "that the affluent, however defined, are exposed to more violence or human rights violations than other segments of society." *Id.* at 75.

Romero argues that the BIA did not consider evidence in the record indicating that landowners and businessmen are targeted by guerrilla groups in Colombia. Unlike the country conditions reports at issue in *Matter of A–M–E & J–G–U–*, Romero points out that the 1997 State Department Asylum Profile states that guerrilla groups extort money from landowners and businessmen to fund their activities. Indeed, the BIA acknowledged that the Country Reports on Human Rights Practices ("USDOS Report") for 1999 and 2000 state that business owners, among other groups, are targeted by guerrilla groups. Based upon the standards articulated in *Matter of A–M–E & J–G–U–*, these reports are evidence that wealthy, landowning businessmen are specifically targeted by guerrilla groups in Colombia and are thus *prima facie* evidence of that group's social visibility for purposes of asylum and withholding of removal. *See id.* at 74. The BIA's failure to consider this evidence in analyzing Romero's proposed social group claim—instead evaluating it only in regard to his imputed political opinion claim—constitutes error. *See Jorge–Tzoc v. Gonzales,* 435 F.3d 146, 150 (2d Cir.2006).

In *Matter of A–M–E & J–G–U–*, the BIA also concluded that the concept of wealth is too indeterminate to form the sole criterion for membership in a social group, as it is incapable of limiting membership "for a large swath of potential members." 24 I. & N. Dec. at 76. The Government argues that Romero's proposed group of landowners is likewise too broad to qualify as a particular social group. However, the BIA's conclusion

that "wealthy Colombians" did not meet the statutory definition of a particular social group was not based on an evaluation of the social group as Romero proposed it—wealthy landowners and businessmen. As Romero argues, the group he proposed is not merely defined by wealth, as was the case in *Matter of A–M–E & J–G–U–*, but by its members' ownership of land and businesses.

In *Tapiero de Orejuela v. Gonzales,* the Seventh Circuit found that the class of educated, landowning cattle farmers was sufficiently distinct to constitute a particular social group that is cognizable under the INA. 423 F.3d 666, 672 (7th Cir.2005). In that case, the petitioner's husband, Mr. Orejuela, owned a farm and two ranches in Colombia, and was threatened by FARC guerrillas while he was visiting one of the ranches. *See id.* at 669. The FARC demanded money to support their activities, and told Mr. Orejuela that they would kill him if he did not pay. *See id.* The Seventh Circuit reasoned that the class of educated, landowning cattle farmers was defined not just by their wealth, and therefore the group's characteristics could constitute a "particular social group." *Id.* at 672.

Here, Romero's credible testimony and other evidence in the record show that he and his family owned land and a business with significant assets. Without further explanation from the BIA as to why Romero's proposed group of "wealthy landowners and the merchant class" is too broad to comprise a particular social group, its conclusion is flawed. *See Poradisova v. Gonzales,* 420 F.3d 70, 77 (2d Cir.2005) (requiring a certain minimum level of analysis from agency opinions denying asylum if judicial review is to be meaningful).

B. Imputed Political Opinion

■ Romero argues that in finding that he failed to establish that the EPL perse-

cuted him on account of imputed political opinion, the BIA failed to consider whether the EPL had a mixed motive in targeting him. In *Delgado v. Mukasey,* we considered a claim of imputed political opinion, wherein the petitioner had been kidnapped by the FARC because of her knowledge of computers, a reason unrelated to political opinion. 508 F.3d 702, 706–07 (2d Cir. 2007). The petitioner testified that the FARC soldiers threatened to kill her if she refused to work with them. *Id.* at 707. She also stated that she was opposed to the FARC, who was unaware that she belonged to a political party. *Id.* We found that although the petitioner was originally kidnapped because of a non-political reason, "it did not necessarily follow that ... her refusal to provide further technological assistance did not support a well-founded fear of future persecution on account of an imputed political opinion." *Id.*

Here, although Romero testified that he was a lifelong member of the Liberal Party, and that he did not cooperate with the EPL because "they are aside from the law" and are "the negative side of the country," the BIA found that the EPL targeted Romero because they wanted money. The BIA reasoned that Romero failed to establish that the EPL imputed a political opinion to him because he "did not testify that he told the EPL that he opposed their political or military agenda." Such disclosure, however, is not required by *Delgado,* where the petitioner likewise did not inform the FARC of her opposition to its activities or her membership in a political party. *Id.* at 707. In that case, we determined that it was reasonable to infer that the FARC would view the petitioner's departure from Colombia as a refusal to collaborate with them. *See id.*

Here, the BIA found no evidence that the EPL threatened or harmed Romero "because he was a wealthy landowner, businessman, or because of his membership in the Liberal Party or Chamber of Commerce, or because wealthy businessm[e]n and landowners are considered capitalists and against the guerrillas who are perceived as socialist according to the respondent." However, the BIA itself has not required asylum applicants "to show conclusively why persecution has occurred or may occur," but "to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds" through direct or circumstantial evidence. *Matter of E–P–,* 21 I. & N. Dec. 860, 861 (B.I.A.1997). The record shows that the EPL targeted Romero whenever he went to his farm. The EPL escalated its activity against Romero after he attempted to defy them, as he testified that they kidnapped and stabbed him repeatedly after he stopped going to the farm and making payments to them. Romero testified that the EPL was aware that he tried to avoid them. It is reasonable to infer from this circumstantial evidence that the EPL viewed Romero's failure to visit the farm as his refusal to accede to its demands. *Delgado,* 508 F.3d at 707. Because the BIA did not evaluate whether the EPL's attack in October 1997 was in retaliation for defying their demands, and whether such defiance bears a political dimension, remand is necessary so that the agency may reevaluate Romero's imputed political opinion claim.

## II. CAT

 Title 8, section 1208.18(a)(1) of the Code of Federal Regulations incorporates the definition of torture contained in the Convention Against Torture:

Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or

her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

In *Khouzam v. Ashcroft,* we interpreted this provision to hold that "torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it." 361 F.3d 161, 171 (2d Cir.2004). We further explained that the acts of private individuals, as Romero alleges, may nevertheless amount to torture if the government of the country where the acts occurred has acquiesced to the acts in violation of its duty to intervene. *See Pierre v. Gonzales,* 502 F.3d 109, 118 (2d Cir.2007).

Here, the BIA properly concluded that Romero was ineligible for CAT relief because it determined that "the Colombian government does not remain 'willfully blind' to the acts of the guerrillas and has not therefore breached its legal responsibility to prevent it. Nor has the lead respondent established the Colombian government acquiesced to the harm suffered by the respondent by the EPL guerrillas." The BIA correctly noted that Romero testified that after the 1997 incident, police found him and took him to the hospital to be treated for his injuries. Romero filed a complaint regarding the incident but never followed up on the case. While Romero argues that the State Department reports indicate that the government rarely prosecutes kidnapping cases, and that it faced "serious challenges to its control over the national territory," that argument is unavailing, as nothing in this record indicates that the police did not attempt to prosecute Romero's complaint. Absent evi-

dence to the contrary, Romero has not shown that the government has acquiesced to the EPL's actions, or that any government official violated a duty to intervene. *See id.* Accordingly, the agency properly determined that Romero's CAT claim fails. Nevertheless, because of the errors in the BIA's analysis of his claims based on particular social group and imputed political opinion, we remand this case.

For the foregoing reasons, the petition for review is GRANTED.