**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CARLOS ERNESTO MEDINA-
VELASQUEZ,

Petitioner,

v.

JEFF SESSIONS, United States
Attorney General,[*]

Respondent.

No. 16-9505
Petition for Review

**ORDER AND JUDGMENT**[**]

Before **KELLY**, **LUCERO**, and **MURPHY**, Circuit Judges.

## I. INTRODUCTION

Carlos Medina-Velasquez, a native and citizen of Honduras, petitions for

review of an order by the Board of Immigration Appeals ("BIA"). The BIA

affirmed an Immigration Judge's ("IJ") decision to deny Medina-Velasquez's

---

[*]In accordance with Fed. R. App. P. 43(c)(2), Jeff Sessions is substituted
for Loretta E. Lynch as the respondent in this action.

[**]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

application for withholding of removal and protection under the Convention

Against Torture ("CAT"). Exercising jurisdiction pursuant to 8 U.S.C. § 1252,

this court **denies** Medina-Velasquez's petition for review.

## II. FACTUAL BACKGROUND

Medina-Velasquez illegally entered the United States without being

admitted or paroled; he came to the attention of the Department of Homeland

Security ("DHS") following a drunk-driving arrest. DHS initiated removal

proceedings by filing a notice to appear, which charged Medina-Velasquez with

being inadmissible. *See* 8 U.S.C. § 1182(a)(6)(A)(i). Medina-Velasquez

conceded he was inadmissible, but sought withholding of removal[1] and relief

under CAT.[2] His withholding-of-removal claim was premised on his membership

in the following asserted "particular social group": "Hondurans who are coerced

into gang membership while enrolled in college and who then escape to the

___

[1]8 U.S.C. § 1231(b)(3). Section 1231(b)(3) restricts the Attorney General's
ability to remove an alien to a country where the "alien's life or freedom would
be threatened . . . because of the alien's race, religion, nationality, membership in
a particular social group, or political opinion." *Id.*

[2]CAT was implemented by the Foreign Affairs Reform and Restructuring
Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681,
2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231). The relevant
regulations are found at 8 C.F.R. §§ 1208.16-.18. "The Convention Against
Torture provides another basis for restricting removal to a particular country.
Pursuant to this treaty, an alien is entitled not to be removed to a country if he or
she can show that it is more likely than not that he or she would be tortured if
removed to that country." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir.
2004) (footnote omitted).

United States, thereby becoming former gang members."  Medina-Velasquez

testified in support of his request for relief from removal and adduced the oral

and written testimony of Thomas Boerman, Ph.D., an expert on Honduras and

Honduran gangs.  For its part, DHS offered into evidence the 2013 Human Rights

Report for Honduras prepared by the United States Department of State.

Medina-Velasquez was raised in a middle-class family in El Progreso,

Honduras; his father was a commercial truck driver and his mother was a

homemaker.[3]  The entire family was "very Catholic," attending Mass every

weekend and celebrating all Holy Days.  He did well in school and, eventually,

studied accounting at a local college.  His troubles began in his second year of

college when members of Mara 18[4] approached him and requested that he do their

homework.  When he refused, they administered a beating.  Some weeks later,

Medina-Velasquez and his friend Efrain were robbed by Mara 18 members while

on their way to a movie.  He thereafter discovered Mara 18 members were forcing

Efrain to sell drugs.  Medina-Velasquez's next interaction with Mara 18 occurred

when he was on his way home from church.  Gang members pointed a gun at his

---

[3]The IJ found, pursuant to the provisions of 8 U.S.C. § 1158(b)(1)(B)(iii), that Medina-Velasquez's testimony was credible.  The BIA did not address this issue.  Given that the IJ's credibility finding is uncontested, the factual background is, for the most part, drawn from Medina-Velasquez's testimony before the IJ.

[4]"Mara 18, also known as the 18th Street Gang, operates throughout the United States, Central America, and Mexico."  *Orellana-Monson v. Holder*, 685 F.3d 511, 515 (5th Cir. 2012).

face and then shot the gun in the air. In response to these interactions, Medina-Velasquez convinced his parents to send him to art school in the Honduran capitol, Tegucigalpa. Medina-Velasquez lived with his godparents in Tegucigalpa for about one year. He testified he did not feel safe in Tegucigalpa because "[t]he Maras are all over Honduras." He did not leave the house, lost weight, and was not able to sleep well. After one year in Tegucigalpa, he returned home because he was "afraid of hiding" and missed his family.

Medina-Velasquez returned to college in El Progreso and did not see any Mara 18 members for two months. Eventually, however, he saw Efrain giving money to gang members. After they recognized Medina-Velasquez, Mara 18 forced him to sell drugs, implying he would be beaten or killed if he refused. Instead of selling the drugs, he flushed them down the toilet and paid Mara 18 out of his own savings. This cycle occurred approximately fifty times and Medina-Velasquez ultimately had to take a job to pay for the drugs he was destroying. Although no one he was close to, including his family, knew he and Efrain were forced to work for the gang, people began to treat them "differently" because they had been seen in public with gang members. Medina-Velasquez and Efrain were eventually initiated into the gang by surviving a beating.[5]

---

[5]This rite of initiation, often referred to as being "jumped in," is common in street gangs. *See, e.g., United States v. Kamahele*, 748 F.3d 984, 994 (10th Cir. 2014) ("Gang members are initiated . . . by being 'jumped in' (when the recruit
(continued...)

After the initiation, Medina-Velasquez's interactions with the Mara 18 worsened. He was given more drugs to sell and was told to sell stolen goods. He did not leave the gang because he believed he would be killed. He so believed because gang members once told him and Efrain to meet them near a snack bar. After they arrived, they saw a black car drive up to a person who was a former Mara 18 member. When the individual went over to the car and leaned in, he was shot. Thinking it the only way to be free of the gang, Medina-Velasquez decided to leave Honduras. He procured a visa from the Mexican consulate, traveled to Mexico by airplane, and entered the United States without inspection. While he was in the United States, he regularly sent money to Efrain to help him escape Honduras. Although Medina-Velasquez told Efrain to keep quiet about his plans, Efrain allowed his girlfriend to throw him a going away party. Gang members "shot up" the party, killing Efrain and two others.

Since Medina-Velasquez has been in the United States, his father and brother have been threatened. Mara 18 members asked his father where he was; his father responded by saying Medina-Velasquez was in Tegucigalpa. Mara 18 members told Medina-Velasquez's father he would pay the consequences if

---

[5](...continued)
fights gang members to prove his toughness) . . . ."); *United States v. Juvenile Male*, 554 F.3d 456, 462 (4th Cir. 2009) ("CAM had participated in 'jump ins,' where members of MS–13 initiated new gang members by beating them for thirteen seconds.").

Medina-Velasquez did not return home. Medina-Velasquez's brother, who works for the health department, was followed on his way to the hospital by a man on a motorcycle. At the hospital, the man put a gun in the brother's face and said he would have to pay if he did not disclose Medina-Velasquez's location. To emphasize his point, the man shot the gun and damaged an ambulance. Gang members painted "MS 18" on the side of his family's home. Given all this, Medina-Velasquez testified his family, along with his neighbors, finally learned he and Efrain had been working with Mara 18.

On cross-examination, Medina-Velasquez clarified that he was not a full member of Mara 18 because he had not killed anyone. Instead, he testified he was simply a "runner" and described the relationship as something akin to an employer/employee relationship. The only "runners" Medina-Velasquez was aware of in El Progreso were Efrain and himself. Medina-Velasquez believed the gang picked him because he did not look like a gang member (i.e, he was a devout Catholic from a middle class family and did not have any tattoos).

Dr. Thomas Boerman testified as an expert on country conditions in Honduras.[6] He testified Honduras is about the size of the state of Virginia and

_____

[6]At the beginning of the hearing before the IJ, Medina-Velasquez's counsel offered Dr. Boerman as an expert as to the following:

Dr. Boerman will offer expert testimony based on his in-depth knowledge of Honduran country conditions and his recognition as an

(continued...)

-6-

has a population of roughly 7,000,000 people. Approximately 36,000 of those 7,000,000 Honduran citizens are gang members.[7] Most gang members are affiliated with either Mara 18 or MS-13, rival gangs, both of which are "truly ubiquitous" in Honduras. Honduran gangs, specifically including Mara 18, are exceptionally sophisticated and exceedingly violent. Only a very small percentage of Honduran youth are forcibly recruited into gangs. Based on information provided by Medina-Velasquez, Dr. Boerman was of the opinion that both Mara 18 and members of the community considered Medina-Velasquez to be a member of the gang.

Due to years of continuous violence, Hondurans live in a state of "hypervigilance that causes them to be really alert to anything in the environment that signals potential risk. And really, there's nowhere more evident, because of the context of migration, and deportation, and social violence, the population is fixated on who leaves the country and who returns." For this reason, Dr.

---

[6](...continued)
expert on gang activity in Honduras; to provide historical context and provide insights regarding current gang activity in Honduras. He will provide insight as to [Medina-Velasquez's] involvement in the Mara-18 gang and provide an assessment regarding substantial risks faced by [Medina-Velasquez] should he return to Honduras.

DHS conceded Dr. Boerman was an expert "in areas so identified."

[7]Notably, however, Dr. Boerman conceded on cross-examination that a significant number of those 36,000 gang members were incarcerated. That is, Dr. Boerman conceded that up to forty percent of the Honduran prison population was made up of gang members.

Boerman opined that if Medina-Velasquez returned home to El Progreso "it would be immediately known to the community that he'd returned and to the Mara-18." Mara 18 would respond by imposing upon Medina-Velasquez "the most egregious harms and possibly death." If on the other hand, Medina-Velasquez relocated to a part of Honduras other than El Progreso, Honduran wariness of strangers would likely lead to one of two possible results: (1) discovery of his identity and transmission of that information to Mara 18 or (2) social ostracism based on lack of family ties and risk of exploitation because of perceptions that those who return from the United States have assets.[8]

## III. LEGAL BACKGROUND

### A. The Relevant Avenues of Relief

#### 1. Withholding of Deportation

Section 1231(b)(3)(A) prohibits removal of an alien "if the Attorney General decides that the alien's life or freedom would be threatened in" his country of origin "because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." "These five categories are called

_____

[8]Dr. Boerman attributed risks of relocating in Honduras not to community or gang perception that Medina-Velasquez is a gang member but, instead, to aspects of Honduran culture stemming from migration/deportation to and from the United States and fear of strangers flowing from generalized gang violence. Dr. Boerman conceded that because Medina-Velasquez did not have tattoos like a normal gang member, there would be nothing to cause "local gangs, local residents, or police" to believe he was a gang member unless he inadvertently disclosed too much personal information about himself.

'protected grounds.'" *Rodas-Orellana v. Holder*, 780 F.3d 982, 986 (10th Cir. 2015). The burden is on the alien to establish eligibility for withholding of removal. 8 U.S.C. § 1231(b)(3)(C). To do so, the alien must establish a "clear probability of persecution" on account of a protected ground. *Karki v. Holder*, 715 F.3d 792, 801 (10th Cir. 2013) (quotations omitted).

The only protected ground identified by Medina-Velasquez in his request for withholding of removal is his membership in the following social group: "Hondurans who are coerced into gang membership while enrolled in college and who then escape to the United States, thereby becoming former gang members." Congress did not define the term "particular social group." This court, therefore, owes deference to the BIA's interpretation of that phrase. *Rodas-Orellana*, 780 F.3d at 990 (concluding BIA's interpretation of the term is reasonable). The BIA interprets "particular social group" to mean "a group of persons all of whom share a common, immutable characteristic . . . such as sex, color, or kinship ties." *Id.* (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)). The common immutable characteristic must be "beyond the power of an individual to change" or be "so fundamental to his identity or conscience that it ought not to be required to be changed." *Id.* (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 234 (BIA 1985)). In addition to immutability, the BIA requires applicants to demonstrate that their proposed social groups are particular and socially distinct. *Id.* at 990-91. "'Particularity' means the group cannot be indeterminate . . . too

-9-

subjective, inchoate, and variable." *Id.* at 990 (quotation omitted). "Social distinction" requires a characteristic or set of characteristics that are "highly visible" and "generally easily recognizable and understood by others" in the relevant society. *Id.* at 991 (quotations omitted). The requirement of visibility does not mean a particular social group "must be ocularly visible to others in society." *Id.* (quotation omitted). "[A] group need not be *seen* by society; it must instead be *perceived* as a group by society. Members of the group may be visibly recognizable, but society can also consider persons to be a group without being able to identify the members by sight." *Id.* (quotation omitted). Ultimately, the matter of social distinction depends on whether "citizens of the applicant's country would consider individuals with the pertinent trait to constitute a distinct social group, and whether"the applicant's community is capable of identifying an individual as belonging to the group." *Id.* (quotations omitted).

## 2. CAT

CAT "prohibits the return of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *Karki*, 715 F.3d at 806 (quotation omitted). A CAT claim differs from a claim for withholding of removal "because there is no requirement that the petitioners show that torture will occur on account of a statutorily protected ground." *Cruz–Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005). "'Acquiescence of a public official requires that the public

official, prior to the activity constituting the torture, have awareness of such activity and thereafter breach his or her legal responsibility to prevent such activity.'" *Id.* (quoting 8 C.F.R. § 1208.18(a)(7)). This standard does not require "actual knowledge, or willful acceptance" by the government. *Id.* (quotation omitted). "Rather, willful blindness suffices to prove acquiescence." *Id.* (quotation and alteration omitted).

## B.  Agency Decision

The IJ concluded Medina-Velasquez had not established eligibility for withholding of removal or CAT protection. According to the IJ, Medina-Velasquez's proposed grouping—"Hondurans who are coerced into gang membership while enrolled in college and who then escape to the United States, thereby becoming former gang members"—lacked, inter alia, the social distinction necessary to qualify as a particular social group. That is, Medina-Velasquez failed to establish that Honduran society perceives "individuals who were coerced into gang membership and then escaped to the United States, thereby becoming former gang members[,] as" a separate and distinct group within the society.[9] Because Medina-Velasquez had neither established past

_____

[9]The IJ's reasoning is as follows:

> [Medina-Velasquez's social] group is largely defined by the persecution he endured, namely his coercion into gang membership. A particular social group, however, "cannot be defined *exclusively* by
> (continued...)

-11-

persecution on account of a protected ground, nor demonstrated a likelihood of

future harm in Honduras due to membership in a particular social group, the IJ

concluded he was not entitled to withholding of removal.

---

[9](...continued)
the fact that it is targeted for persecution." *Matter of C-A-*, 23 I & N
Dec. at 960. Furthermore, Honduran society does not perceive those
who "escape to the United States, thereby becoming former gang
members" as distinct from society in a significant way. *See
Rivera-Barrientos [v. Holder]*, 658 F.3d [1222] at 1231-32 [(10th
Cir. 2011)]; *Matter of M-E-V-G-*, 26 I & N Dec. at 238. [Medina-
Velasquez] testified that his family and people in his neighborhood
did not know he was working for the gangs, but . . . "put everything
together" after Efrain's death. [His] statements reflect that his
neighborhood in Honduras may realize that [he] fled because of his
involvement with the gangs. [He] failed to establish, however, that
Honduran society recognizes or perceives a group of individuals who
were coerced into gang membership and then escaped to the United
States, thereby becoming former gang members as separate and
distinct from others within the society.

    . . . . Withholding of removal is not available to victims of
indiscriminate violence . . . . "Acts of common criminality or
personal hostility" do not establish eligibility for asylum. *Vatulev v.
Ashcroft*, 354 F.3d 1207, 1209 (10th Cir. 2003). Those targeted for
violence, abduction, or extortion by a gang or cartel due to their
affluence are not generally recognized to be members of a particular
social group. *See Matter of A-M-E- & J-G-U-*, 24 I & N Dec. 69
(BIA 2007). Those targeted for forced recruitment by a gang or a
cartel are not generally recognized to be members of a cognizable
particular social group either. *See Matter of M-E-V-G-*, 26 I & N
Dec. 227; *Matter of S-E-G-*, 24 I & N Dec. 579; *Matter of E-A-G-*, 24
I & N Dec. 591 (BIA 2008). Furthermore, those deported from the
United States are not generally recognized to be members of a
particular social group. *See Matter of W-G-R-*, 26 I & N Dec. 208
(BIA 2014).

-12-

With respect to his request for protection under CAT, the IJ found that Medina-Velasquez had not provided any evidence he would more likely than not be tortured upon return to Honduras. That is, evidence of general lawlessness in Honduras failed to carry Medina-Velasquez's burden of demonstrating that he was at a particularized risk of torture. *See generally Lin v. U.S. Dep't of Justice*, 432 F.3d 156, 159-60 (2d Cir. 2005). Alternatively, the IJ concluded Medina-Velasquez failed to demonstrate any such torture that might occur would be at the direction of, or with the acquiescence of, government officials.

Medina-Velasquez appealed to the BIA, arguing his proposed social group should be considered to have the requisite social distinction. He also argued he demonstrated eligibility for CAT protection. In a brief order, a single member of the BIA denied Medina-Velasquez's appeal. *See* 8 C.F.R. § 1003.1(e)(5) (empowering a single member of the BIA to resolve certain appeals in "a brief order").[10] The BIA agreed with the IJ that Medina-Velasquez had not established that his proposed social group was or would be perceived in Honduran society as a socially distinct group. The BIA also affirmed the IJ's denial of Medina-

---

[10]When the BIA reviews an IJ's decision under the provisions of § 1003.1(e)(5), it is the BIA's "decision that constitutes the final order of removal under 8 U.S.C. § 1252(a)." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). "Accordingly, in deference to the agency's own procedures, we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Id.* Nevertheless, this court can look to the IJ's written decision to furnish context and as a guide to the BIA's reasoning. *Id.*

Velasquez's CAT claim because he did not testify about any specific threats of physical harm from the government, nor did the record evidence indicate a Honduran official would instigate or acquiesce in Medina-Velasquez's torture.

## IV. Discussion

### A. Withholding of Removal

The BIA concluded the "particular social group" advanced by Medina-Velasquez in support of his request for withholding of removal did not exhibit the required "social distinction." "What constitutes a particular social group is a pure question of law that we review de novo." *Cruz-Funez*, 406 F.3d at 1191.

Medina-Velasquez proposed a social group composed of "Hondurans who are coerced into gang membership while in college and who then escape to the United States, thereby becoming former gang members." The record provides no basis to conclude Hondurans recognize this grouping as socially distinct. At the hearing before the IJ, Medina-Velasquez testified he did not know of anyone who shared his experience of being coerced into working for the gangs in college before ultimately escaping to the United States. Likewise, there is nothing in the State Department's country report on Honduras to indicate the group identified by Medina-Velasquez is perceived as distinct by Honduran society. *See* Honduras 2013 Human Rights Report. Instead, the record evidence demonstrates gang violence is exceedingly widespread in Honduras and that Mara 18 and other gangs are inclined to violence against *any person* who opposes the gang's interests in

-14-

any way, large or small.  *See Rivera-Barrientos v. Holder*, 666 F.3d 641, 653 (10th Cir. 2012) (reaching same conclusion as to MS-13 in El Salvador).

Medina-Velasquez generally argues Dr. Boerman's testimony demonstrates his proposed group has social distinction.  He fails, however, to cite any specific portion of Dr. Boerman's testimony that supports this argument.  In contrast to his assertions, an examination of Dr. Boerman's testimony reveals no suggestion that Medina-Velasquez's proposed group is recognized as distinct by Honduran society.  Dr. Boerman testified gang and community members in El Progreso would regard Medina-Velasquez as a member because they knew him and knew he had joined Mara 18.  He further testified, however, that communities other than El Progreso would have no reason to identify Medina- Velasquez as a current or former gang member.[11]  Instead, he merely opined that Medina-Velasquez

_____

[11]Dr. Boerman testified as follows:

> Counsel: If—my understanding is, and again tell me if this is incorrect, there was an aspect of recruitment by recruiting someone with religious background because they could do work for the gang but not be perceived as being associated with the gang, like running drugs, or transporting drugs, or something like that.  Is that right?

> Dr. Boerman: Mm-hmm.  Yes, that's correct.

> Counsel: And so, that person, the reason they're working for the gang is because they don't look like a gang member.  Is that right?

> Dr. Boerman: Yes, yeah.

(continued...)

would be regarded warily as an outsider and stranger if he moved to a new community in Honduras. Nor did he testify that former gang members who had been recruited in college and escaped to the United States were regarded by the community as a group distinct from other gang recruits or that individuals in the proposed group are readily identifiable by others in the community.

---

[11](...continued)
. . . .

Dr. Boerman: Now, how long that's going to hold up over time, but that is the initial objective.

Counsel: Okay. So if someone . . . in that capacity with the gang were to go to the United States and to come back to a city where he was never known, how would someone have any idea that he was associated with the gang?

Dr. Boerman: Unless the person was tattooed, there probably would be no basis for the population in the new – where he relocated, there probably would be no basis for concluding that he was part of the gang.

Counsel: Because if they didn't see a tattoo, or see him dress like a gang member, or talk like known gang members, there would be no reason for the average person on the street to say, "Hey, that's a gang member?"

Dr. Boerman: Right. Again, if we just drop the person into a new community and we take out of the equation the likelihood for all sorts of things to occur such as people approaching him, finding out who he is, where he's from, and communicating that back to the home community, at which point there's a communication line established around who this person is. If we say this person can insert into a  new community and essentially live in a [indiscernible], then probably, there would be no basis for concluding that local gangs, local residents, or police would decide he was a gang member.

To be clear, Medina-Velasquez has not even attempted to explain how people in Honduras could or would identify him or others as former college-aged gang recruits who escaped to the United States to become former gang members. Nor has he explained why these characteristics would mark him and others as distinct from other individuals who resist gangs. *See Rodas-Orellana*, 780 F.3d at 992-93. This court has previously concluded that a group characterized simply by resistance to gang recruitment lacks social distinction. *Id.* at 991-93 (holding that the group "El Salvadoran males threatened and actively recruited by gangs, who resist joining because they oppose the gangs" lacks social distinction from others threatened by gang violence (quotation omitted)); *Rivera-Barrientos*, 666 F.3d at 653 (holding that the group "women between the ages of 12 and 25 who have resisted gang recruitment" lacks social distinction).

On the record presented in this case, the BIA correctly concluded "Hondurans who are coerced into gang membership while in college and who then escape to the United States, thereby becoming former gang members" is not a cognizable particular social group for purposes of withholding of removal.

**B. CAT**

In concluding Medina-Velasquez had not established an entitlement to relief under CAT, the BIA determined the IJ "did not clearly err in finding that [Medina-Velasquez] did not testify to any specific threats of physical . . . harm from the government, as opposed to gang members, and the background evidence

-17-

in the record does not sufficiently indicate that a Honduran official likely would instigate or acquiesce in any torture." Absent a nexus between any potential torture of Medina-Velasquez and action by the government of Honduras, the BIA concluded Medina-Velasquez was not entitled to relief under CAT. *See Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014) ("[R]elief under [CAT] requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return to his homeland; and second, is there sufficient state action involved in that torture." (quotation omitted)); *Karki*, 715 F.3d at 806-07 (explaining meaning of "acquiescence" as it is used in CAT). We review the determination of a lack of state action for substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B) (providing that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"); *Witjaksono v. Holder*, 573 F.3d 968, 978 (10th Cir. 2009).

The BIA's determination that Medina-Velasquez failed to demonstrate the Honduran government would acquiesce in any torture he might be subjected to upon a return to Honduras is supported by substantial evidence. Dr. Boerman's declaration stated that Honduran gangs "engage in extraordinary levels of violence directed at gang rivals, state officials and the public." The Honduran government responded to the ascent of gangs through "a strategy known colloquially as 'Mano Dura' (Firm, or Tough Hand)." Although it was Dr. Boerman's opinion that this strategy was "overly simplistic" and

-18-

counterproductive, there is no indication in his testimony that the policy is anything other than a good-faith attempt to deal with gang violence. Instead, lack of resources, corruption, and intimidation of prosecutors and judges has left the government largely incapable of protecting the public at large. Nevertheless, as noted by Dr. Boerman on cross-examination, the Honduran government makes some attempt to police the gangs, as up to forty percent of the Honduran prison population is made up of gang members.

Given all this, the evidence in the record does not compel a conclusion that the government of Honduras would acquiesce in any torture Medina-Velasquez might be subject to upon a return to Honduras. In particular, the evidence presented by Medina-Velasquez does nothing more than paint a generalized picture of widespread corruption and governmental ineffectiveness. From that generalized evidence, Medina-Velasquez asks this court to speculate that the Honduran government will be, at a minimum, willfully blind to any torture he would suffer in Honduras. This court has held, however, that we do not require evidence showing a government's policing efforts are successful to conclude the government was not acquiescing in any potential torture. *Ferry v. Gonzales*, 457 F.3d 1117, 1131 (10th Cir. 2006). Other circuits have likewise concluded that a government's inability to provide complete protection does not demonstrate government acquiescence. *See, e.g.*, *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 351 (5th Cir. 2006) (concluding Colombian government's inability to provide

-19-

complete security from guerilla group did not constitute government acquiescence); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242–43 (11th Cir. 2004) (concluding Peruvian government's inability to apprehend members of terrorist group that robbed and assaulted petitioner did not demonstrate government acquiescence). Medina-Velasquez, on the other hand, has not identified a single precedent holding that an evidentiary record similar to the one in this case compelled a conclusion of governmental acquiescence. In fact, there is not a single citation to any authority in those sections of his opening and reply briefs addressing his CAT claims.

## V.  CONCLUSION

For those reasons set out above, Medina-Velasquez's petition for review is hereby **DENIED**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge