**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BENJAMIN RODAS-ORELLANA,

    Petitioner,

v.

ERIC H. HOLDER, JR., United States
Attorney General,

    Respondent.

Nos. 14-9516 & 14-9548

---

**ON PETITION FOR REVIEW FROM ORDERS OF
THE BOARD OF IMMIGRATION APPEALS**

---

Catharine A. Davies (Richard M. Lynch, with her on the brief), Bull & Davies, P.C.,
Denver, Colorado, appearing for Petitioner.

Corey L. Farrell, Attorney (Joyce R. Branda, Acting Assistant Attorney General;
Anthony W. Norwood, Senior Litigation Counsel; and Wendy Benner-León, Trial
Attorney, on the brief), United States Department of Justice, Washington D.C., for
Respondent.

---

Before **BRISCOE**, **MATHESON**, and **MURPHY**, Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

    Benjamin Rodas-Orellana entered the United States without inspection to escape

gang recruitment in El Salvador. The Department of Homeland Security ("DHS")

initiated removal proceedings.  Mr. Rodas-Orellana applied for asylum and withholding of removal under the Immigration and Nationality Act ("INA").[1]

The Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") denied his application because he failed to show a well-founded fear of persecution on account of membership in a particular social group.  They concluded his proposed social group—Salvadorans who resist gang recruitment[2]—lacked "social visibility" and thus did not constitute a particular social group.  They also concluded he had failed to show he was persecuted because of his membership in the proposed social group.

After the BIA issued its final order of removal in this case, it issued decisions in two other cases that modified the social visibility requirement to be one of "social distinction."  *See Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 227 (BIA 2014); *Matter of W-G-R-*, 26 I. & N. Dec. 208, 208 (BIA 2014).  In light of these decisions, Mr. Rodas-

---

[1] Before the Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA"), Mr. Rodas-Orellana also sought withholding of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, which the IJ and the BIA denied.  But he has abandoned this issue in his petition for review ("PFR").  We therefore do not consider it here.  *See Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (quotations omitted)).

[2] As we explain below, Mr. Rodas-Orellana's proposed social group changed throughout the proceedings.  The IJ and BIA considered the group of those "in opposition to joining or becoming a gang member in El Salvador," AR at 132, and "[p]ersons who have been subjected to recruitment efforts by criminal gangs, but who have refused to join," *id*. at 26.

- 2 -

Orellana filed a motion to reconsider (mislabeled as a motion to reopen),[3] which the BIA denied.

In his petition for review ("PFR"), Mr. Rodas-Orellana contests both the final order of removal and the denial of his motion to reconsider. Exercising our jurisdiction to review the final order of removal and the denial of a motion to reconsider under 8 U.S.C. § 1252(a)(1), (b)(6), (b)(9), we deny his PFR. *See Infanzon v. Ashcroft*, 386 F.3d 1359, 1361-62 (10th Cir. 2004); *see also Sarmadi v. INS*, 121 F.3d 1319, 1322 (9th Cir. 1997) (concluding "that other recent changes to the INA did not alter our traditional understanding that the denial of a motion to reconsider or to reopen generally does fall within our jurisdiction over final orders of deportation").

## I.  BACKGROUND

### A.  *Legal Background*

This case concerns two ways a noncitizen who has entered the United States without inspection can remain:  asylum and withholding of removal under the INA.

To qualify for asylum, the applicant must be a "refugee."  8 U.S.C. § 1158(b)(1)(A).  A refugee is unable or unwilling to return to his or her country because of "persecution or a well-founded fear of persecution on account of race, religion,

---

[3] The parties refer to this motion as a motion to reopen, but the BIA correctly characterized it as a motion to reconsider.  "[A] change in case law is not considered new evidence for purposes of a motion to reopen.  It is a motion for reconsideration, as opposed to a motion to reopen, that asks the agency to consider a change in the law." *Salim v. Holder*, 728 F.3d 718, 721 (7th Cir. 2013) (citation and quotations omitted); *see Wei v. Mukasey*, 545 F.3d 1248, 1252-54 (10th Cir. 2008).  This distinction, however, does not matter for the purposes of our analysis on the merits.  But we refer to the motion as a motion to reconsider in this opinion for the sake of accuracy.

nationality, membership in a particular social group, or political opinion." *Id.*

§ 1101(a)(42). These five categories are called "protected grounds." *See Dallakoti v. Holder*, 619 F.3d 1264, 1266-67 (10th Cir. 2010). An applicant can obtain refugee status: (1) "through evidence of a well-founded fear of future persecution" on account of a protected ground; (2) "through a showing of past persecution" on account of a protected ground, which gives rise to a rebuttable presumption of having a well-founded fear of future persecution on account of a protected ground; or (3) "through a showing of past persecution so severe as to provide a compelling argument against removal, even though there is no danger of future persecution on the basis of a protected ground." *Rivera-Barrientos v. Holder*, 666 F.3d 641, 646 (10th Cir. 2012).

As for withholding of removal, the INA prohibits removal "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

The applicant must establish eligibility for asylum and withholding of removal. *Id*. §§ 1158(b)(1)(B)(i), 1231(b)(3)(C). The burden of proof for withholding of removal is higher than for asylum. *Dallakoti*, 619 F.3d at 1267. For asylum, a noncitizen must prove he or she is a refugee, which requires a showing of past persecution or a well-founded fear of persecution on account of a protected ground. *Rivera-Barrientos*, 666 F.3d at 645. To show a well-founded fear, an applicant must at least show that persecution is a "reasonable possibility." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (quotations omitted). For withholding, an applicant must prove a "clear

probability of persecution" on account of a protected ground. *Karki v. Holder*, 715 F.3d 792, 801 (10th Cir. 2013) (quotations omitted). Failure to meet the burden of proof for an asylum claim necessarily forecloses meeting the burden for a withholding claim. *Id.*

B. ***Factual & Procedural History***

1. **Mr. Rodas-Orellana's Application for Asylum and Withholding**

Mr. Rodas-Orellana is a citizen of El Salvador. He entered the United States without inspection on or around September 6, 2006, when he was 17 years old. On September 16, 2006, DHS commenced removal proceedings, charging Mr. Rodas-Orellana with removability for being a noncitizen present in the United States without being admitted or paroled. *See* 8 U.S.C. § 1182(a)(6)(A)(i).

On August 28, 2007, Mr. Rodas-Orellana appeared before an IJ and conceded the charge of removability. He applied, however, for asylum and withholding of removal, indicating he sought to escape from "extreme poverty and gang violence" in El Salvador. AR at 339.[4] Mr. Rodas-Orellana specifically contended the Mara Salvatrucha gang ("MS-13") posed a threat to him because he refused to join. He argued this constituted past persecution or a well-founded fear of persecution on account of membership in a particular social group.[5]

---

[4] AR refers to the agency record for Case No. 14-9548 (Mr. Rodas-Orellana's PFR of his motion to reconsider), which includes all the documents contained in the agency record for Case No. 14-9516 (Mr. Rodas-Orellana's PFR of his final order of removal) and additional documents.

[5] Mr. Rodas-Orellana also claimed persecution based on political opinion, a claim he abandoned at some point in the proceedings. It is therefore not at issue on appeal.

In his application materials and in testimony before the IJ, Mr. Rodas-Orellana described the pressure he faced to join MS-13. When he was 15 years old, MS-13 asked him to join for the first time. MS-13 members told him that if he did not join, he would have to pay a fine. And if he did not have the money, he would have to "pay with [his] life." *Id.* at 321. When he was 16 years old, MS-13 members stopped him while he was walking home. They asked him to join the gang. When he refused, they beat him and left him bleeding from his face. In another encounter, gang members again told him to join, but he refused. They said he should think about what he was doing. And in a final encounter, gang members told him that if he joined, they would protect him and give him money. He again refused.

During his testimony before the IJ, Mr. Rodas-Orellana said, "They hit me once but that was it. And they would ask me to join whatever they were doing." *Id.* at 114. He explained MS-13 members "asked me to give them money and I didn't want to." *Id.* at 115; *see also id.* at 127 ("Q. Okay. And why did they hit you? A. Because they asked me for money and I didn't have any."). When asked if he was hurt "very badly," Mr. Rodas-Orellana responded, "Yes, they . . . hit me. I went to the hospital but it wasn't that bad." *Id.* at 115.

Mr. Rodas-Orellana stated he was afraid to return to El Salvador because the gangs "think that one come[s] to the United States to make money so that I would have money and they would want to get my money and they would kill me for that." *Id.* at 120. When asked where he got this idea, he replied, "Because to many people that has happened, people that come from the United States, they try to do anything or kill you for

your money." *Id.* at 122. The following exchange between Mr. Rodas-Orellana and his attorney then ensued:

> Q. Okay. So if [the gang] came, why would they want to take money from you?
> A. Because that's their job, cheating people.
> Q. So would they essentially be stealing the money from you?
> A. No, they just come and say give me the money or you're going to die.
> Q. But they do that to all kinds of people in El Salvador, right?
> A. Yes, like for instance, for a store or something, they get there and they set a rent, something that has to be paid monthly.
> Q. Okay. And so these people, these gang members, they're criminals, right?
> A. Yes.

*Id.* at 126. Mr. Rodas-Orellana also noted gang members killed his brother-in-law because he failed to pay timely "rent," which is "essentially the payment of extortion or protection money to the gang members." *Id.* at 79, 322.

2. **The IJ's Decision**

On June 28, 2012, the IJ denied Mr. Rodas-Orellana's application for asylum and withholding of removal. First, the IJ concluded Mr. Rodas-Orellana did not "establish[] past persecution although he has suffered somewhat in the hands of the gang members." *Id.* at 77. According to Mr. Rodas-Orellana himself, his injury "wasn't bad," *id.* at 78, and his other two interactions with gang members seemed to the IJ to be "very minor episodes," *id.* Second, the IJ determined Mr. Rodas-Orellana had "not establish[ed] a connection between the harm that he faces in El Salvador and one of the protected grounds." *Id.* at 80. The IJ noted Mr. Rodas-Orellana had "not identified any reason for him to be targeted by the gang members other than their general desire to have the population in their area cooperate with [them] either by providing financial support or by

joining the rank." *Id.* at 79. Further, Mr. Rodas-Orellana's claim failed because "El Salvadoran youth who have been subject to recruitment efforts by the gangs and [have] rejected or resisted membership[] do not constitute a 'particular social group.'" *Id.*

3. **The BIA's January 22, 2014 Final Order of Removal**

Mr. Rodas-Orellana filed an appeal with the BIA, which it rejected in a final order of removal. The BIA agreed with the IJ that "[p]ersons who have been subjected to recruitment efforts by criminal gangs, but who have refused to join fails the particularity and social visibility tests and does not constitute a particular social group for asylum purposes." *Id.* at 26. The BIA also found "imputed or perceived American nationality" or "people who appear to be of American nationality or perceived to be wealthy" did not constitute a particular social group. *Id.*[6] Further, it found Mr. Rodas-Orellana had "failed to establish that the attempts to recruit him were even partially motivated by a desire to persecute him for a ground enumerated in the Act—much less that such a motivation constituted or would constitute 'one central reason' for the gang members' actions." *Id.* The BIA declined to "determine whether the actions taken against [Mr. Rodas-Orellana] rose to the level of past persecution." *Id.*

---

[6] As we explain below, Mr. Rodas-Orellana shifted his proposed social group throughout the proceedings. By addressing "imputed or perceived American nationality" and "people who appear to be of American nationality or perceived to be wealthy," the BIA was responding to a proposed social group in Mr. Rodas-Orellana's appeal to the BIA. AR at 26.

4. **The BIA's May 1, 2014 Denial of the Motion to Reconsider**

On March 11, 2014, Mr. Rodas-Orellana filed a motion to reconsider in light of two BIA decisions, *Matter of M-E-V-G-* and *Matter of W-G-R-*, issued after the BIA's January 22 final order of removal. He argued these decisions announced "new legal standards" that the IJ and BIA ought to consider. *Id.* at 18. In a May 1, 2014 decision denying the motion, the BIA held "imputed or perceived American nationality is not a characteristic that is fundamental to a person's identity such that it cannot be or should not be required to be changed." *Id.* at 3 (quotations omitted). It noted *Matter of M-E-V-G-* and *Matter of W-G-R-* did not alter this conclusion.[7]

5. **Consolidated PFR**

On June 13, 2014, Mr. Rodas-Orellana filed a joint motion to consolidate his PFRs from the two BIA decisions, which this court granted. In his consolidated PFR, Mr. Rodas-Orellana seeks judicial review of the January 22 final order of removal and the May 1 denial of his motion to reconsider.

---

[7] Some explanation is needed as to the timeliness of Mr. Rodas-Orellana's motion. Motions to reconsider must be filed within 30 days of a final order of removal. 8 U.S.C. § 1229a(c)(6)(B). His motion was not filed within this time period, and he could have filed within 30 days because *Matter of M-E-V-G-* and *Matter of W-G-R-* were decided on February 7, 2014. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 227; *Matter of W-G-R-*, 26 I. & N. Dec. at 208. We do not think this affects our consideration of the BIA's denial of the motion to reconsider on the merits because the BIA did not raise timeliness in its denial of the motion and it can afford sua sponte consideration at any time, as it did here. AR at 3 ("We will afford sua sponte consideration to the motion."); *see* 8 C.F.R. § 1003.2(a) ("The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision.").

## II. **DISCUSSION**

After identifying the standard of review, we analyze both the BIA's January 22 final order of removal and its May 1 denial of the motion to reconsider. In discussing the final order of removal, we consider the following questions: (1) Did the BIA err in determining Mr. Rodas-Orellana was not a member of a particular social group? And do recent BIA decisions warrant a remand on this issue? (2) Did the BIA err in determining Mr. Rodas-Orellana was not persecuted on account of his membership in a particular social group? Because we conclude the BIA did not err on these issues nor in denying the motion to reconsider, we deny Mr. Rodas-Orellana's PFR.[8]

---

[8] Mr. Rodas-Orellana also claims the IJ erred in deciding he did not suffer past persecution. We decline to review this issue.

The scope of our review depends on the form of the BIA decision. *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007). The BIA may adjudicate a noncitizen's claims in three ways: "(1) a decision by a three-member panel with a full explanatory opinion; (2) a summary affirmance by a single member of the Board without opinion; or (3) a decision via a brief order by a single member of the Board, affirming, modifying, or remanding the IJ's decision." *Id.* (citations omitted). The January 22 BIA decision falls within the third category. We consult the IJ's opinion only "to the extent that the BIA relied upon or incorporated it." *Id.* (quotations omitted). We can affirm the BIA order only on grounds addressed by the BIA. *Id.* And "[w]hen the BIA has failed to address a ground that appears to have substance, we should not reverse on that ground, but instead remand." *Rivera-Barrientos*, 666 F.3d at 645.

Here, the BIA explicitly declined to determine whether the actions taken against Mr. Rodas-Orellana rose to the level of past persecution. Instead, it denied the appeal for failure to establish membership in a particular social group and failure to establish a nexus between the alleged harm and a protected ground. We therefore cannot affirm on the issue of past persecution. We also will not remand on this point because, even if Mr. Rodas-Orellana could demonstrate past persecution, he has not shown any such persecution occurred on account of a protected ground, as we discuss below.

- 10 -

## A. *Standard of Review*

On an asylum claim, "[w]e review the BIA's findings of fact under a substantial-evidence standard.  Under this standard, the BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Rivera-Barrientos*, 666 F.3d at 645 (alteration omitted) (citation and quotations omitted).  "[W]e review the BIA's legal decisions de novo," but we defer to the BIA's interpretation of ambiguous provisions of the INA, and must accept the BIA's interpretation if it is reasonable.  *Id.*  "The BIA's determination that [an applicant] was not eligible for asylum must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quotations omitted).

We review the BIA's decision on a motion to reconsider for an abuse of discretion. *See Belay-Gebru v. I.N.S.*, 327 F.3d 998, 1000 n.5 (10th Cir. 2003).  "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Maatougui v. Holder*, 738 F.3d 1230, 1239 (10th Cir. 2013) (quotations omitted).  There is no abuse of discretion when the BIA's "rationale is clear, there is no departure from established policies, and its statements are a correct interpretation of the law, even when the BIA's decision is succinct." *Id.* (quotations omitted).

- 11 -

B.  *January 22 Final Order of Removal*

1.  **Membership in a Particular Social Group**

a.  *Legal background*

Congress did not define the term "particular social group" in the INA.  We therefore owe deference to the BIA's interpretation of that phrase, provided the interpretation is reasonable.  *See Rivera-Barrientos*, 666 F.3d at 645.  In *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), the BIA interpreted "particular social group" to mean "a group of persons all of whom share a common, immutable characteristic . . . such as sex, color, or kinship ties."  The common characteristic must be "beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not to be required to be changed."  *Id.* at 234.  In recent years, the BIA has refined its definition of "particular social group," and now additionally requires "particularity" and "social visibility."  *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 76 (BIA 2007); *Matter of C-A-*, 23 I. & N. Dec. 951, 959 (BIA 2006).  "Particularity" means the group cannot be "indeterminate . . . too subjective, inchoate, and variable." *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 76.  The meaning of "social visibility" has evolved over time.

The BIA initially defined "social visibility" to mean "the recognizability" of the group in question.  *Matter of C-A-*, 23 I. & N. Dec. at 959.  BIA decisions identified socially visible groups in circumstances where, for example, certain characteristics made a group "highly visible" and "generally easily recognizable and understood by others to constitute social groups."  *Id.*; *see id.* at 955 (noting the BIA has recognized particular

- 12 -

social groups in a number of cases, including those involving "Filipinos of mixed Filipino-Chinese ancestry," "young women of the Tchamba-Kunsuntu tribe of northern Togo who did not undergo female genital mutilation as practiced by that tribe and who opposed the practice," and "former members of the national police of El Salvador").

Recently, the BIA renamed the "social visibility" requirement to be "social distinction." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 228, 234-38, 240-43, 247; *Matter of W-G-R-*, 26 I. & N. Dec. at 208, 211-12, 215-18. In those decisions, the BIA clarified "social visibility" was never intended to mean that a social group must be "ocularly visible to others in society." *Matter of W-G-R-*, 26 I. & N. Dec. at 216 (quotations omitted). "[A] group need not be *seen* by society; it must instead be *perceived* as a group by society. Members of the group may be visibly recognizable, but society can also consider persons to be a group without being able to identify the members by sight." *Id.* (citations omitted).

Even before *Matter of M-E-V-G-* and *Matter of W-G-R-*, this court in *Rivera-Barrientos* declined to interpret "social visibility" literally, finding "no need to interpret social visibility as demanding the relevant trait be visually or otherwise easily identified." 666 F.3d at 652. "Rather, social visibility requires that the relevant trait be potentially identifiable by members of the community, either because it is evident or because the information defining the characteristic is publicly accessible." *Id.* In determining whether a group is socially visible, this court noted the BIA considers whether "citizens of the applicant's country would consider individuals with the pertinent trait to constitute

a distinct social group," and whether "the applicant's community is capable of identifying an individual as belonging to the group." *Id.* at 650-51.

b. *Analysis*

We hold Mr. Rodas-Orellana has failed to demonstrate (i) his proposed group— "El Salvadoran males threatened and actively recruited by gangs, who resist joining because they oppose the gangs," Aplt. Br. at 7[9]—is socially distinct,[10] or (ii) remand is warranted in light of *Matter of M-E-V-G-* and *Matter of W-G-R-*.

i. Social distinction

Because we conclude below that *Matter of M-E-V-G-* and *Matter of W-G-R-* are consistent with our past interpretation of social visibility, *Rivera-Barrientos* controls this case. We held in that case that "women between the ages of 12 and 25 who have resisted

_____

[9] We use this description of the social group because it seems to comport most closely with the facts of this case. Mr. Rodas-Orellana's brief also describes the group as "El Salvadoran males who have been actively recruited and threatened by gangs and who refused to join," "El Salvadoran males who are recruited and threatened by gangs to join, but who refuse because of moral opposition to gang activity," and "El Salvadoran males who resist gang recruitment and violence." Aplt. Br. at 10, 22, 24. At oral argument, Mr. Rodas-Orellana's counsel narrowed the group by stating only *young* males compose the group. *See* Oral Argument at 9:00-9:54, 16:45-17:24.

[10] The parties do not argue immutability on appeal, and the BIA did not rely on this ground in its January 22 final order of removal to determine Mr. Rodas-Orellana's proposed group of Salvadoran males who resist gang recruitment was not a particular social group.

As for particularity, the BIA denied Mr. Rodas-Orellana's appeal in part because his alleged social group of Salvadoran males who resist gang recruitment failed the particularity test. Although Mr. Rodas-Orellana's briefing on particularity leaves much to be desired, he does seem to contest the BIA's particularity determination by analogizing *Rivera-Barrientos* to this case. In *Rivera-Barrientos*, we held that a similar proposed group met the particularity requirement. *See* 666 F.3d at 650. Regardless, we decline to address particularity here because our social distinction ruling is dispositive.

- 14 -

gang recruitment" in El Salvador were not a particular social group because this cohort failed the social visibility requirement. *Rivera-Barrientos*, 666 F.3d at 653-54. Even though MS-13 targeted her for resisting recruitment, Ms. Rivera-Barrientos failed to offer evidence that Salvadoran society considers young women who have resisted gang recruitment to be a distinct social group. *Id.* at 653.

*Rivera-Barrientos* relied on the BIA decision of *Matter of S-E-G-*, 24 I. & N. Dec. 579, 579, 588 (BIA 2008), which held Salvadoran youth who had been subjected to MS-13 recruitment efforts and who rejected membership did not constitute a particular social group. The BIA decided the proposed group lacked social visibility because there was little in the record "to indicate that Salvadoran youth who are recruited by gangs but refuse to join (or their family members) would be 'perceived as a group' by society, or that these individuals suffer from a higher incidence of crime than the rest of the population." *Id.* at 587. The BIA did not doubt that gangs retaliate against those who refuse to join. *Id.* "However, such gangs have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises and territorial power." *Id.* "The respondents are therefore not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests." *Id.*

Other circuits have agreed. *See Umana-Ramos v. Holder*, 724 F.3d 667, 674 (6th Cir. 2013) (holding "young Salvadorans who have refused recruitment by the MS gang" was not a socially visible group because there was no evidence they were perceived as a distinct segment of the population); *Gaitan v. Holder*, 671 F.3d 678, 682 (8th Cir. 2012)

(holding "young males from El Salvador who have been subjected to recruitment by MS-13 and who have rejected or resisted membership in the gang" was not a particular social group because they did not "cover a discrete class of persons who would be perceived as a group by the rest of society"); *Orellana-Monson v. Holder*, 685 F.3d 511, 516, 522 (5th Cir. 2012) (holding "Salvadoran males, ages 8 to 15, who have been recruited by Mara 18 but who have refused to join" lacked social visibility because there was little evidence these people would be perceived as a group by society).

Here, Mr. Rodas-Orellana's claim is based on the same or a substantially similar group that was proposed and rejected in *Rivera-Barrientos*, *Matter of S-E-G-*, and several other circuit court decisions. As in those cases, Mr. Rodas-Orellana does not present evidence suggesting Salvadorans (including the gangs) perceive individuals who resist gang recruitment as a distinct social group.

Instead, Mr. Rodas-Orellana contends he has identified a particular social group because gangs targeted him for refusing to join. The evidence did show he was threatened and hurt for refusing to join. *See, e.g.*, AR at 123 ("The maras will come and ask me to join them. And if you're in one side or the other side and if I don't join either one, they will kill me."); *id.* at 215 ("He reports that, when he was 16 years old, he was stopped by the gang and again pressured to join. He again refused and this time was assaulted."). But this does not establish that he belongs to a distinct social group. The evidence instead depicts a widespread gang violence problem in El Salvador. *See, e.g.*, *Rivera-Barrientos*, 666 F.3d at 653; *Matter of S-E-G-*, 24 I. & N. Dec. at 587; AR at 311 ("Violent, organized gangs are a major factor in the crime situation and are often behind

- 16 -

extortion attempts."); *id.* at 326-34 (describing gang presence and gang activities in El Salvador in a Department of State Issue Paper). Thus, although gang members may have targeted Mr. Rodas-Orellana for resisting recruitment, this reflects generalized gang violence toward anyone resisting their efforts rather than defining a distinct social group. *See Matter of S-E-G-*, 24 I. & N. Dec. at 587; *see also Ramos-Lopez v. Holder*, 563 F.3d 855, 862 (9th Cir. 2009) ("While MS-13 members may be able to identify those who have resisted recruitment, it is not because the group, as a group, is visible; rather, MS-13 members appear to keep tabs on individuals who have refused to join.").

Indeed, the record shows Salvadoran gangs indiscriminately threaten people for monetary gain or for opposing them. *See, e.g.*, AR at 115 ("Q. So how did it happen that they beat you up? A. Because I was home sitting there and they went by and asked me to give them money and I didn't want to so that's why."); *id.* at 117 ("Q. Was that the only time [the beating] happened? A. Yes, but to other people, if they oppose to them, it always happens."); *id.* at 126 ("Q. But they [threaten] all kinds of people in El Salvador, right? A. Yes, like for instance, for a store or something, they get there and they set a rent, something that has to be paid monthly."). A pertinent Department of State Issue Paper, which Mr. Rodas-Orellana submitted in support of his asylum and withholding application, stops short of finding that Salvadoran males who refuse recruitment are persecuted for that status:

> There have been allegations by some asylum applicants that gangs search throughout the country to find persons who have refused to join them and then take out reprisals against those individuals. Gangs may threaten or reportedly occasionally even assault someone who refuses offers to join the gang. In general, however, most people are able to avoid joining a gang

and can continue their normal activities. While local gang members might retaliate against someone in the gang's immediate zone of activity, based on the amount of effort involved, it would be unlikely for the gang to track down a person who refused recruitment into the gang in another part of the country, unless that person had done something that threatened the gang's operations.

*Id.* at 331.

Mr. Rodas-Orellana has failed to demonstrate his proposed social group is socially distinct.

###### ii. Remand in light of *Matter of M-E-V-G-* and *Matter of W-G-R-*[11]

Mr. Rodas-Orellana argues we should remand the January 22 final order of removal in light of *Matter of M-E-V-G-* and *Matter of W-G-R-*. Aplt. Br. at 6, 30-31. We reject this argument.[12]

---

[11] As previously explained, we have jurisdiction to review both a final order of removal and a denial of a motion to reconsider. *See Infanzon*, 386 F.3d at 1361 (suggesting this court could review both the BIA final order of removal and the BIA order denying the motion to reopen had the petitioner timely filed a PFR from the final order of removal). Mr. Rodas-Orellana relies on *Matter of M-E-V-G-* and *Matter of W-G-R-* to argue that we should remand because the BIA erred in its January 22 and May 1 orders. Our discussion here shows why *Matter of M-E-V-G-* and *Matter of W-G-R-* do not warrant remand on either order.

[12] If we were to consider only the case law existing at the time of the final order of removal, remand would be unwarranted because *Rivera-Barrientos* and *Matter of S-E-G-* did not rely on ocular visibility. *See Rivera-Barrientos*, 666 F.3d at 652; *Matter of M-E-V-G-*, 26 I. & N. Dec. at 247 (noting it would reach the same result in *Matter of S-E-G-* if the BIA had applied the term "social distinction" rather than "social visibility"). But may we consider BIA decisions that were issued *after* the final order of removal? Other circuits have permitted consideration of BIA decisions issued after a final order of removal. *See, e.g.*, *Pirir-Boc v. Holder*, 750 F.3d 1077, 1079 (9th Cir. 2014); *Paloka v. Holder*, 762 F.3d 191, 192-93 (2d Cir. 2014). We do the same here and conclude that remand is not warranted.

- 18 -

First, Mr. Rodas-Orellana has not explained how those decisions, which merely clarified the interpretation of "social visibility," would alter the BIA's decision on remand. In holding Mr. Rodas-Orellana's group failed the social visibility requirement, the BIA did not rely on ocular visibility. *See Nazaraghaie v. I.N.S.*, 102 F.3d 460, 465 (10th Cir. 1996) ("[E]ven assuming *arguendo* that the BIA failed to weigh certain pieces of evidence fully, the result in this case would be no different. Any error on the part of the BIA is therefore harmless . . . ."); *see also Mendiola v. Holder*, 576 F. App'x 828, 830-31, 842-43 (10th Cir. 2014) (unpublished) (rejecting a noncitizen's change-of-law argument based on a Supreme Court decision issued after his final order of removal because the case did not affect whether he was removable).[13]

Second, Mr. Rodas-Orellana argues that because the BIA in *Matter of M-E-V-G-* remanded to the IJ, we should remand this case to the BIA. We disagree. The BIA explained in *Matter of M-E-V-G-* why it was remanding to the IJ: "[T]he respondent's proposed particular social group has evolved during the pendency of his appeal, our guidance on particular social group claims has been clarified since this case was last before the Immigration Judge, and the Third Circuit has indicated that a remand may be appropriate." *Matter of M-E-V-G*, 26 I. & N. Dec. at 252. No similar bases to remand apply here. Although, as explained below, Mr. Rodas-Orellana changed his proposed

---

[13] Unpublished opinions lack precedential value but may be cited for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

social group during these proceedings, the changes do not warrant a remand.[14]  Further, the BIA analyzed social visibility consistently with *Matter of M-E-V-G-*, *Matter of W-G-R-*, *Matter of S-E-G-*, and *Rivera-Barrientos* because it did not rely on ocular visibility.[15]

Finally, our research shows that two circuits have remanded final orders of removal in part because of *Matter of M-E-V-G-* and *Matter of W-G-R-*.  These other circuit cases, however, do not help Mr. Rodas-Orellana.  The Ninth Circuit remanded in *Pirir-Boc v. Holder*, 750 F.3d 1077, 1079-81 (9th Cir. 2014), because the BIA relied on *Matter of S-E-G-* to determine that individuals "taking concrete steps to oppose gang membership and gang authority" in Guatemala did not constitute a particular social group.  In remanding, the Ninth Circuit first noted "the BIA may not reject a group solely because it had previously found a similar group in a different society to lack social distinction or particularity."  *Id.* at 1084.  Second, it faulted the BIA for failing to perform

---

[14] *Matter of M-E-V-G-* was the product of two remands from the Third Circuit. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 228-29.  In the first remand, the court "materially change[d]" the definition of the noncitizen's proposed social group.  *Id.* at 252 n.17.  The BIA remanded to the IJ in *Matter of M-E-V-G-* to reconsider a final order of removal in light of this different group.  *Id.*  We are not faced with the same scenario here.

[15] In addition to remanding for the reason articulated in footnote 14, the BIA remanded to the IJ in *Matter of M-E-V-G-* because of the Third Circuit's second remand. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 252.  The Third Circuit had remanded a second time because it refused to afford deference to the BIA's requirement of social visibility.  *Valdiviezo-Galdamez v. Att'y Gen. of the United States*, 663 F.3d 582, 603 (3d Cir. 2011).  It thought the BIA required "on-sight visibility" for "social visibility," and then determined that such a requirement conflicted with prior BIA decisions recognizing social groups that lacked "on-sight visibility."  *Id.* at 604-07.  No such conflict arises here because neither this court nor the IJ or BIA in this case has interpreted social visibility to require ocular visibility, distinguishing this case from *Matter of M-E-V-G-*.  *See Rivera-Barrientos*, 666 F.3d at 652.

"the required evidence-based inquiry as to whether the relevant society recognizes [the petitioner's] proposed social group." *Id.* This failure was especially problematic when there was evidence the group may in fact be recognized in Guatemalan society. *Id.* As such, it was unclear whether the evidence presented was sufficient to meet the standard in *Matter of M-E-V-G-* and *Matter of W-G-R-*. *Id.* Finally, the court remanded to consider the group in light of a Ninth Circuit case holding that witnesses who testified against gang members constituted a particular social group—a group the *Pirir-Boc* court characterized as "comparable" to the one at issue. *Id.* at 1082, 1084-85.

Our case is distinguishable. First, unlike in *Pirir-Boc*, Mr. Rodas-Orellana argues for nearly the same proposed group, from the same country, as was rejected in *Matter of S-E-G-*. His proposed group is not "comparable" to any this court or any other court has found to constitute a particular social group. Second, the IJ in *Pirir-Boc* found evidence in the record indicating the proposed group was socially distinct. No such evidence exists here. Third, although the Ninth Circuit remanded in part to determine whether the evidence presented was sufficient to meet the revised standard in *Matter of M-E-V-G-* and *Matter of W-G-R-*, there is no evidence of social distinction here that would need to be reconsidered in light of these recent BIA decisions.

The Second Circuit in *Paloka v. Holder*, 762 F.3d 191, 194, 199 (2d Cir. 2014), remanded in light of *Matter of M-E-V-G-* and *Matter of W-G-R-* to determine whether unmarried, young women in Albania between 15 and 25 years old constituted a particular social group. It did so, first, because it found "remand is appropriate in this case following the agency's clarification of its approach" on adjudicating "particular social

- 21 -

group" claims. *Id.* at 197. Second, because there was evidence the petitioner faced persecution by Albanian police, *id.* at 193, the Second Circuit found the petitioner's case "straddle[d] the line between individuals threatened by state-sponsored or state-condoned criminality on account of their membership in a particular social group and individuals threatened only because they live in a country with pervasive criminality," *id.* at 198. Finally, the petitioner redefined her particular social group during her appeal to include an age range "that finds support in the evidence." *Id.* at 199.

Here, by contrast, Mr. Rodas-Orellana presents no evidence the Salvadoran government had a role in his alleged persecution. Further, although he refined the definition of his group in his PFR by specifying Salvadoran *males* who resisted gang recruitment, he fails to point to any evidence indicating that such a narrowing lends more support to his argument for social distinction.

In sum, Mr. Rodas-Orellana has failed to demonstrate he is a member of a particular social group, and remand in light of the recent BIA decisions is not warranted because the BIA did not rely on ocular visibility in denying relief in this case. And, as we discuss below, even assuming he is a member of a particular social group, Mr. Rodas-Orellana has not shown his membership was a central reason for MS-13's threats and violence against him.

2. **Persecution on Account of Membership in a Particular Social Group**

    a. *Legal background*

The INA requires that persecution occur "on account of" a protected ground. 8 U.S.C. § 1101(a)(42). A protected ground must be "at least one central reason for

persecuting the applicant." *Id.* § 1158(b)(1)(B)(i). The Supreme Court has noted the INA "makes motive critical" to obtaining asylum. *Elias-Zacarias*, 502 U.S. at 483; *see also id.* at 483 (holding the petitioner failed to establish that "guerillas will persecute him *because of* [his] political opinion, rather than because of his refusal to fight with them"). We similarly have said, "[T]he victim's protected characteristic must be central to the persecutor's decision to act against the victim." *Rivera-Barrientos*, 666 F.3d at 646 (quotations omitted); *see also Dallakoti*, 619 F.3d at 1268 (interpreting "one central reason" to mean "the protected ground cannot play a minor role in the alien's past mistreatment or fears of future mistreatment" and "cannot be incidental, tangential, superficial, or subordinate to another reason for harm" (quotations omitted)).

b. *Analysis*

Although MS-13 threatened and assaulted him for resisting recruitment, Mr. Rodas-Orellana has failed to establish that his membership in a particular social group was a central reason for MS-13's actions. His testimony suggests only that the gang wanted to take his money or have him join the gang. When he refused, the gang reacted not to his membership in a particular group but to his refusal to pay or join. And no evidence indicates Mr. Rodas-Orellana would be subject to future harm based on his membership in the group.

In *Rivera-Barrientos*, the noncitizen presented evidence that MS-13 had targeted her for resisting recruitment, but we "distinguish[ed] between persecution based on social status, and an individualized reaction to the applicant based on her threat to the gang's interests." 666 F.3d at 653. Because the evidence in that case suggested "gang violence

- 23 -

is widespread in El Salvador, and that [the gang] directs harm against any individual where doing so may promote the gang's interests," those who resist recruitment are "not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests." *Id.*; *see Matter of S-E-G-*, 24 I. & N. Dec. at 587-88 (noting the Department of State's report on El Salvador did not "mention forced recruitment by gang members or persecution against individuals who resist the gang, and the respondents have not submitted evidence that persuades us that gangs commit violent acts for reasons other than gaining more influence and power, and recruiting young males to fill their ranks"); *Matter of E-A-G-*, 24 I. & N. Dec. 591, 594 (BIA 2008) ("[I]ndividuals who resist gang recruitment may face the risk of harm from the rejected gang. But such a risk would arise from the individualized reaction of the gang to the specific behavior of the prospective recruit.").

For these reasons, Mr. Rodas-Orellana has not established he was threatened or harmed on account of his membership in a particular social group.

## C. *May 1 Denial of the Motion to Reconsider*

Mr. Rodas-Orellana moved for the BIA to reconsider its final order of removal in light of the BIA's subsequent decisions in *Matter of M-E-V-G-* and *Matter of W-G-R-*. We reject his PFR from the denial of his motion. As background, we provide a brief summary of how Mr. Rodas-Orellana's proposed social group has changed in these proceedings.

At each step, Mr. Rodas-Orellana has offered different proposed social groups. Before the IJ, Mr. Rodas-Orellana claimed his social group consisted of those "in

- 24 -

opposition to joining or becoming a gang member in El Salvador." AR at 132. But, as the Government points out, in his appeal to the BIA, Mr. Rodas-Orellana explicitly claimed his social group consisted of those perceived as coming to El Salvador from the United States and having money. Nonetheless, he might also have implicitly raised the Salvadoran males group because he appealed the IJ's determination on his past persecution, which could not have been based on the coming-from-America-with-money group given he had not yet been to the United States at the time of the alleged persecution.[16] In any case, the BIA rejected both proposed groups in its January 22 final order of removal.

In his motion to reconsider, Mr. Rodas-Orellana failed to specify his proposed social group nor did he explain how *Matter of M-E-V-G-* and *Matter of W-G-R-* changed legal standards in a way that was material to his case. In its May 1 decision denying the motion, the BIA addressed only the coming-from-America-with-money group. The BIA rejected the argument that "imputed or perceived American nationality" constituted a particular social group, and held *Matter of M-E-V-G-* and *Matter of W-G-R-* did not alter this conclusion. *Id.* at 3 (quotations omitted).

---

[16] When challenged at oral argument on whether Mr. Rodas-Orellana had presented the Salvadoran males group in his briefing with the BIA, Mr. Rodas-Orellana's counsel responded, "I understand what you're saying, but I do believe that when [the BIA] looked at the case law, and maybe this was a failure to reiterate what we believed was inherent to the case, which was the class membership, I think there was an inherent sense that the class membership had carried through all of the briefs. And then when the decision came down from the Board of Immigration Appeals, they only addressed . . . this Americanization." Oral Argument at 22:30-23:29.

Now, in his PFR before this court, Mr. Rodas-Orellana claims his proposed group is "El Salvadoran males threatened and actively recruited by gangs, who resist joining because they oppose the gangs." Aplt. Br. at 7. And at oral argument, Mr. Rodas-Orellana's counsel narrowed the group by stating only *young* males compose the group. *See* Oral Argument at 9:00-9:54, 16:45-17:24.

In denying the motion to reconsider, the BIA addressed only the coming-from-America-with-money group. That is the only group Mr. Rodas-Orellana explicitly identified in his appeal brief to the BIA. The BIA said this group failed to meet the immutability requirement for a particular social group. In his PFR, Mr. Rodas-Orellana does not challenge this determination. If Mr. Rodas-Orellana presented only this social group in his appeal to the BIA, his failure to contest the immutability determination constitutes waiver of his challenge to the denial of his motion to reconsider. *See Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue.").

But even if we interpret his briefing before the BIA as having implicitly raised the Salvadoran males group, any error on the BIA's part in failing to consider this group would have been harmless, as explained above in our analysis of the BIA's January 22 final order of removal.

III. **CONCLUSION**

We deny the PFR. Mr. Rodas-Orellana has failed to establish he is a member of a particular social group or that he was persecuted on account of any such membership.

- 26 -

*Matter of M-E-V-G-* and *Matter of W-G-R-* do not alter this analysis.  We also deny Mr.

Rodas-Orellana's challenge to the BIA's denial of his motion to reconsider.