**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 25, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

YAQUELIN MARISOL
ALVARADO-DE GUTIERREZ;
J.Z. GUTIERREZ-ALVARADO;
G.S. GUTIERREZ-ALVARADO,

     Petitioners,

v.

MERRICK B. GARLAND,
United States Attorney General,

     Respondent.

No. 23-9574
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.
_____

The lead Petitioner, Yaquelin Marisol Alvarado-De Gutierrez (Petitioner),

filed applications for asylum, restriction on removal,[1] and protection under the

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Restriction on removal used to be called "withholding of removal." _Neri Garcia v. Holder_, 696 F.3d 1003, 1006 n.1 (10th Cir. 2012) (internal quotation marks omitted).

Convention Against Torture (CAT), on behalf of herself and her children and co-petitioners, J.Z. Gutierrez-Alvarado and G.S. Gutierrez-Alvarado (collectively, Petitioners).  They are all natives and citizens of El Salvador.[2]  An immigration judge (IJ) denied the applications, and the Board of Immigration Appeals (BIA) dismissed their appeal.  They now petition for review of the agency's order or removal.  Exercising jurisdiction under 8 U.S.C. § 1252, we deny the petition.

## BACKGROUND

### 1.  Petitioners' Evidence and Arguments before the IJ

According to her testimony and the affidavits submitted in support of her applications, Petitioner fears returning to El Salvador because members of the Mara 18 gang threatened her family.  She testified that she owned a clothing business in El Salvador, and she and her husband, who also had a business, owned land and property in the country.  In 2013, Salvadoran police told them "some subjects" were casing their house and warned them to be careful going out at night.  R. at 97.  Soon, gang members were threatening them and demanding money as "rent," R. at 168, and someone stole tools and work equipment from her husband.  Petitioner and her husband believed gang members were responsible and reported the theft to police.  Her husband submitted a report naming two suspects—both were gang members.  Police officers asked questions and issued a report but made no arrests.  *See* R. at 197-203 (police report).

---

[2] While in the United States, Petitioner had another child, who is a United States citizen and thus is not a co-petitioner.

2

After this incident, the threats grew more frequent, with gang members demanding money from Petitioner and her husband and threatening to kill them if they refused. Petitioner learned from someone at church that their family's name appeared on a list of people in the community who had "more economic stability." R. at 109. And she worried gang members were retaliating against her family for going to the police. When the family returned home one night, the door to their home was open and gang members were inside the house. The men bound the family with tape, threatened them, demanded money, and left them tied up in the garage. The men told the family they would pay a "steep price" for having reported them to the police. R. at 101. Petitioner and her husband did not report this incident to police.

The family then moved to the town where her parents lived. After about four months, the gang found them and resumed the harassment. Petitioner testified gang members threatened them "constantly." R. at 106. The family moved again to live with relatives in another town, but the same thing happened—the gang found them and continued to make "personal threats" and demand money. R. at 107. The family relocated a third time; again, the gang found them and made threats against them and their relatives. At that point, Petitioner and her husband decided to come to the United States.

Petitioner also recounted that her cousin, who worked with her husband, had been "threatened a lot" and was ultimately shot and killed. R. at 111. She believed gang members murdered him. *Id.* Her uncle filed a complaint with the police, but

3

the investigation produced no information about who killed her cousin.  Petitioner's brother, who lived in a different town in El Salvador, had also been threatened by a gang and ultimately came to the United States.

Petitioner testified that if she returned to El Salvador, she would still be in danger "[b]ecause [she and her husband] filed the complaint with the police against" the gang, R. at 110, and the gang would find them wherever they lived in El Salvador.  She believes the police and the gang "have a relationship" because she once "saw a gang member giving . . . money to a police officer."  R. at 112-13.  And she came to believe the police sent gang members to watch the family's house and that "what happened to [the family] was because of what [the police] didn't do."  R. at 113.  Petitioner admitted the family still owned land in El Salvador—which her husband's father managed—and neither he nor the other relatives they lived with there had been threatened since Petitioner and her husband left.

At the end of the hearing, Petitioner, through counsel, argued she fears the harm she suffered in El Salvador will continue if she returns and this constitutes persecution on three protected grounds.  First, the persecution was and will be based on her anti-gang political opinion.  Gangs are political organization because they are "intertwined with the government," R. at 126, she explained, and they "wield such power that they are like a state entity," R. at 127.  Second, the gangs persecuted her family based on their resistance and reporting to police, which "amount[s] to having a political opinion," R. at 124.  Finally, Petitioner maintained she was persecuted and fears future persecution based on her membership in two proposed particular social

4

groups (PSGs): (1) private business owners who have resisted the gangs, and (2) individuals perceived as enemies of the gangs. According to Petitioner, the Salvadorian government is "unwilling or unable to take the necessary steps to control this criminal organization." R. at 128.

## 2.  The IJ's Decision

The IJ found Petitioner credible but concluded Petitioners did not qualify for asylum, restriction on removal, or CAT relief. The IJ denied their applications for asylum and restriction on removal for two independent reasons.

First, the IJ found Petitioner's fear stemmed from criminal gang activity, not persecution on account of a protected ground. In so concluding, the IJ found neither of Petitioner's proposed PSGs was legally cognizable, and rejected her argument that the alleged persecution was based on an imputed anti-gang political opinion, in part because "the evidence does not show that the [Mara] 18 gang or any criminal group is tantamount to . . . a government in El Salvador." R. at 57. Second, the IJ found Petitioners had not shown they "cannot seek the protection of [their] government" if they return to El Salvador. R. at 59. In support, the IJ pointed to Petitioner's testimony that police alerted the family to suspicious people near their home and investigated—albeit unsuccessfully—her husband's report of the theft. The IJ also observed that Petitioner and her husband did not report the home invasion incident, so the police had no opportunity to investigate it. Citing Petitioner's documentary evidence, including country conditions reports, the IJ found "the objective evidence shows that Salvadoran authorities have cracked down heavily on gang violence, even

5

to the point of being criticized for being too harsh in their response to suspected gang activity." *Id*. Finally, the IJ denied Petitioners' application for CAT protection, concluding the "criminal incidents" committed by the gangs did "not amount to torture" and there was no evidence the Salvadoran government would consent to or acquiesce in any torture. R. at 60.

### 3. The BIA Appeal and Decision

On appeal to the BIA, Petitioners challenged the IJ's conclusions that they failed to show (1) persecution because of a political opinion or cognizable PSG, and (2) they faced torture by or with the acquiescence of the Salvadoran government if they returned. Petitioners acknowledged that to demonstrate their entitlement to asylum or restriction on removal they had to show their claimed "persecution was committed by the government or by a force the government is unable or unwilling to control," R. at 11, but they did not challenge the IJ's finding they failed to make that showing.

The BIA affirmed the IJ's decision and dismissed their appeal.[3]

---

[3] Petitioners' articulation of their second PSG in their brief before the BIA differed somewhat from their articulation of that PSG before the IJ. *Compare* R. at 11, 15-16 (BIA brief, describing second PSG as "individuals perceived as enemies of the gang and who filed police reports against gang members") *with* R. at 123-24 (argument before the IJ, describing second PSG as "individual[s] perceived as an enemy of the gang"). To the extent their articulation of the second PSG constituted a new proposed PSG, the BIA declined to address it.

## DISCUSSION

This case involves a single BIA member's brief order under 8 C.F.R. § 1003.1(e)(5). We review that order as the final agency determination, "limit[ing] our review to issues specifically addressed therein." *Diallo v. Gonzales*, 447 F.3d 1274, 1279 (10th Cir. 2006). When the BIA adopts the IJ's rationale by reference, as it did here, we may "consult the IJ's decision to give substance to the BIA's reasoning." *Razkane v. Holder*, 562 F.3d 1283, 1287 (10th Cir. 2009). "We review the BIA's legal determinations *de novo*, and its findings of fact for substantial evidence." *Aguayo v. Garland*, 78 F.4th 1210, 1216 (10th Cir. 2023). Under that standard, its "factual findings [are] conclusive unless any reasonable adjudicator would be compelled to reach a contrary conclusion." *Aguilar v. Garland*, 29 F.4th 1208, 1211 (10th Cir. 2022) (internal quotation marks omitted).

### 1. Asylum and Restriction on Removal

An applicant is eligible for asylum if she is a "refugee" within the meaning of the INA. *See* 8 U.S.C. § 1158(b)(1)(A). An applicant qualifies as a refugee if she is unable or unwilling to return to her country of nationality because of "persecution or a well-founded fear of persecution on account of" any of five protected grounds, including "membership in a particular social group." 8 U.S.C. § 1101(a)(42). Asylum applicants must demonstrate eligibility by proving they are refugees. 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. § 1208.13(a).

To qualify for restriction on removal, an applicant must show a "clear probability" of persecution on account of one of the statutorily protected grounds.

7

*Rodas-Orellana*, 780 F.3d 982, 987 (internal quotation marks omitted).  This is a higher burden of proof than the standard for asylum, which requires the applicant to prove only that such persecution is a "reasonable possibility."  *Id.* (internal quotation marks omitted).  Thus, an applicant's inability to meet the asylum burden necessarily forecloses meeting the greater restriction burden.  *See id.*

The "persecution may be inflicted by the government itself, or by a non-governmental group that the government is unwilling or unable to control."  *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004) (internal quotation marks omitted); *see also Rivera-Barrientos v. Holder*, 666 F.3d 641, 646 (10th Cir. 2012) (holding that one element of a claim of past persecution giving rise to a presumption of a well-founded fear of future persecution is that the persecution was "committed by the government or forces the government is either unable or unwilling to control." (internal quotation marks omitted)).  If the persecution is by a nongovernmental group, the applicant has the burden of establishing that the government is unwilling or unable to control the group.  *See id.* at 645 (holding that applicants must establish refugee status, which requires establishment of this element, by a preponderance of the evidence).

When a tribunal rejects a claim on multiple independent grounds, the appellant must challenge each ground.  *See Lebahn v. Nat'l Farmers Union Unif. Pension Plan*, 828 F.3d 1180, 1188 (10th Cir. 2016).  Failing to challenge a determination that is "by itself, a sufficient basis for" denying relief forecloses success on appeal.  *Murrell v. Shalala*, 43 F.3d 1388, 1390 (10th Cir. 1994).

8

Here, Petitioner raises several challenges to the BIA's adoption of the IJ's determination that she failed to establish past persecution and a well-founded fear of future persecution on a protected ground. In particular, she takes issue with the finding that the harm she suffered did not amount to persecution and that neither of her proposed PSGs was cognizable. But the IJ also denied her applications on the independent ground that she failed to show the alleged persecution was inflicted by the Salvadoran government itself, or by a nongovernmental group that the government is unwilling or unable to control. Although Petitioner did not challenge that determination in her BIA appeal, the BIA adopted it in affirming the IJ's ruling. Petitioner acknowledges she had to make that showing to establish her eligibility for asylum and restriction on removal, *see* Aplt. Opening Br. at 7, but she does not seek review of the agency's determination that she failed to do so. She thus waived any challenge to that ruling. *See Krastev v. INS*, 292 F.3d 1268, 1280 (10th Cir. 2002) ("Issues not raised on appeal are deemed to be waived.").

Having so concluded, we need not address her challenges to the agency's determination that she failed to show persecution because of a cognizable PSG. *See Lebahn*, 828 F.3d at 1188 (stating, in reviewing a district court ruling, that where a party argues one ground but gives the court "no basis to disturb" another of the underlying rulings, "we must affirm"); *see also INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.");

9

*Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir. 1991) ("We will not undertake to decide issues that do not affect the outcome of a dispute.").

## 2. CAT Relief

The CAT "prohibits the return of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *Karki v. Holder*, 715 F.3d 792, 806 (10th Cir. 2013) (internal quotation marks omitted). The applicant has the burden to establish her eligibility for CAT relief. 8 C.F.R. § 1208.16(c)(2).

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). "[W]illful blindness suffices to prove acquiescence." *Karki*, 715 F.3d at 806 (internal quotation marks omitted). A government's inability to offer complete protection does not demonstrate governmental acquiescence. *See Tamara-Gomez v. Gonzales*, 447 F.3d 343, 351 (5th Cir. 2006). Nor does general evidence of corruption and a lack of sufficient resources for law enforcement to effectively combat crime. *See Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005). The BIA's CAT "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020) (internal quotation marks omitted).

Here, the IJ denied Petitioners' request for CAT protection, finding the harm the family suffered did not rise to the level of torture and the evidence showed "the

10

police did not acquiesce to the gang's illicit activity when they knew of it." R. at 60. The IJ also observed that although Petitioners submitted some documentary evidence "showing the shortcomings of law enforcement in El Salvador, other evidence documents how the Salvadoran government is cracking down on gang activity." *Id.* The IJ acknowledged "the Salvadoran government could be more effective in its investigation and prosecution of general crime, and in curbing high crime rates," but concluded based on "the totality of the evidence" that Petitioners did not show they "will more likely than not face torture by the Salvadoran government or by any criminal or criminal organization against which the government refuses to take action." R. at 60-61. On administrative appeal, Petitioners challenged the IJ's denial of CAT relief, but the BIA adopted and affirmed the IJ's decision, "finding no error of fact or law." R. at 3.

Petitioners presented no evidence that the Salvadoran government participated in the gang's threats and victimization of the family, and substantial evidence supports the agency's conclusion that they failed to establish that the government acquiesced in it. The police warned the family about people casing their house and investigated after Petitioner's husband reported the theft. There is no evidence that Petitioner or her husband reported the incident when gang members tied the family up and threatened them in their home, so there was no basis for the IJ to find that the police would have turned a blind eye to the gang's criminal activities. And we find no error in the agency's conclusion that the inability of police to protect the family did not constitute governmental acquiescence. *See Ferry v. Gonzales*, 457 F.3d 1117,

11

1131 (10th Cir. 2006) (upholding agency's determination that the government's recognition of a threat and providing of a security grant used to reinforce Ferry's property demonstrated that the government was not acquiescing in torture). While we are sympathetic to Petitioner's circumstances, she has identified no evidence that would compel a reasonable adjudicator to conclude that the government would participate or acquiesce in their torture if they return to El Salvador.

## CONCLUSION

We deny the petition for review.

Entered for the Court

Veronica S. Rossman
Circuit Judge